# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | **06cv4859**<br>**JUDGE GETTLEMAN**<br>**MAGISTRATE JUDGE ASHMAN** |
| Plaintiff, | |
| v. | : CASE NO. |
| AA CAPITAL PARTNERS, INC., and JOHN A. ORECCHIO, | **F I L E D** *L'AL* |
| | SEP - 8 2006 |
| Defendants. | MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

### NATURE OF THE ACTION

1.     The Commission brings this emergency enforcement action to halt ongoing fraudulent conduct by the defendants, AA Capital Partners, Inc. ("AA Capital"), an investment advisory firm registered with the Commission, and its President and co-owner, John A. Orecchio ("Orecchio"). AA Capital is the investment adviser for a number of union pension funds for which it manages more than $194 million. Of these funds, more than $60 million are in cash in bank accounts which AA Capital controls. From May 2004 to the present, AA Capital and Orecchio defrauded AA Capital's investment advisory clients by misappropriating at least $10.7 million from their accounts and using the money as their own. Of these funds, AA Capital kept and used at least $5 million to pay its business expenses. In addition, Orecchio and AA Capital transferred at least $5.7 million to accounts designated by Orecchio, including those of a horse farm in Michigan and of a company that manages a "strip club" in Detroit.

2.    In addition to its fraudulent conduct, AA Capital Partners has failed to make and keep the books and records required of it by its registration with the Commission.

3.    Through the activities alleged in this complaint, defendant AA Capital has, and unless enjoined, will continue to, directly or indirectly, engage in transactions, acts, practices or courses of business which are violations of Sections 204, 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-4, 80b-6(1), 80b-6(2) and 80b-6(4)] and Rules 204-2(a)(1), 204-2(a)(2), 204-2(a)(6), and 206(4)-4 thereunder [17 C.F.R. §§ 275.204-2(a)(1), 275.204-2(a)(2), 275.204-2(a)(6)and 275.206(4)-4].

4.    Through the activities alleged in this complaint, defendant Orecchio has, and unless enjoined, will continue to, directly or indirectly, aid and abet AA Capital's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] .

## JURISDICTION

5.    This Court has jurisdiction pursuant to Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14].

6.    Defendants, directly or indirectly, have made and are making use of the mails or the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business alleged herein.

7.    There is a reasonable likelihood that the defendants will, unless enjoined, continue to engage in the transactions, acts, practices, and courses of business set forth in this complaint and transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

8.      AA Capital is a Delaware corporation with its principal place of business in Chicago, Illinois. AA Capital is an investment adviser registered with the Commission since April 8, 2002. AA Capital is owned by Orecchio, and Paul Oliver, Jr. ("Oliver"), who is its Chairman and a Managing Director.

9.      Orecchio, age 40, is a resident of Arlington Heights, Illinois. Orecchio owns 50% of AA Capital. Since April 2002, Orecchio has been AA Capital's President and a Managing Director. Orecchio primarily solicited prospective clients for AA Capital, but also helped run several private equity funds which AA Capital manages for its pension fund clients.

## AA CAPITAL'S INVESTMENT ADVISORY BUSINESS

10.     AA Capital is a relatively small investment advisory firm that specializes in providing investment advisory services to union pension funds. AA Capital currently manages approximately $194 million for six different union pension funds.

11.     AA Capital principally invests its clients' assets in several private equity funds managed by affiliates of AA Capital. As of July 31, 2006, AA Capital's affiliated private equity funds hold approximately $126 million in client funds.

12.     AA Capital also maintains bank accounts for its advisory clients which it calls client trust accounts. As of July 31, 2006, these client trust accounts held approximately $68 million in cash deposits. AA Capital's contracts with its advisory clients give it full discretionary authority to withdraw cash from these client trust accounts.

13.     AA Capital's contracts with its advisory clients provide that it earns a fee of up to 2% of the assets under management for managing the client's assets. In addition, the principals of AA Capital (including Orecchio and Oliver) have equity interests in the affiliated private equity funds through

general partnerships in which they are partners. Through these general partnerships, the principals of AA Capital may earn a share of the returns generated in the affiliated private equity funds provided that those returns exceed a threshold agreed upon in its contracts with AA Capital's clients.

14.     AA Capital is in extremely poor financial shape, with liabilities far exceeding its present assets. According to draft financial statements prepared by AA Capital, its 2005 revenues totaled $2,018,585, while its expenses for the period totaled $7,151,605. Accordingly, it had a 2005 operating deficit of more than $5 million. According to AA Capital's draft financial statements, it spent more than $4.4 million on salaries in 2005, or more than twice the firm's revenues. Payments AA Capital made to Orecchio for his salary are included in this amount. According to Orecchio's 2005 W-2, AA Capital paid Orecchio at least $1.1 million in wages, tips or other compensation in 2005.

15.     As a registered investment adviser, AA Capital was required to make and keep true, accurate and current books and records relating to its investment advisory business, including the following:

      a.  a journal or journals, including cash receipts and disbursements, records, and any other records of original entry forming the basis of entries in any ledger;

      b.  general and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts; and

      c.  all trial balances, financial statements, and internal audit working papers relating to the business of such investment adviser.

## DEFENDANTS' MISAPPROPRIATION OF CLIENT FUNDS

16.     Under its contracts with its clients, AA Capital is authorized to transfer a certain amount on a periodic basis from its client trust accounts to AA Capital's operating account.

17.     However, AA Capital does not transfer client funds to its own account solely based on its contractual entitlement to the funds. Instead, AA Capital transfers funds from its client trust accounts to its operating account to fund whatever activities and expenses it or Orecchio deems appropriate.

18.     In 2004, Orecchio approached AA Capital's Chief Financial Officer, Mary Beth Stevens ("Stevens"), and directed her to have AA Capital reimburse him for his personal tax liabilities. Stevens reported to Orecchio as AA Capital's President. Orecchio told Stevens that the reimbursement was necessary because of a miscalculation of taxes he owed relating to at least one of AA Capital's affiliated private equity funds.

19.     Under Orecchio's direction, between May 2004 and October 2005, AA Capital withdrew at least $5.7 million from its client trust accounts in more than 20 separate installments and deposited those funds into its operating account. From there, Orecchio directed Stevens to send the client funds to various other accounts that he designated. Among these accounts are those of a horse farm in Michigan called M & J Animal Rescue, L.L.C. ("M & J"), and Orecchio's company, Lonyo, L.L.C. ("Lonyo"), which purportedly manages a Detroit "strip club." Neither business is related to investment advisory services AA Capital provides to its clients.

20.     In addition to the above, during 2005, AA Capital misappropriated at least an additional $5 million from its client trust accounts as a way to cover the shortfall between what it earned and what it spent. AA Capital withdrew these funds from its client trust accounts, deposited them into its operating accounts and used them to pay the expenses of running its business.

21.     Neither AA Capital nor Orecchio had the authority to use client funds as alleged above. In addition, AA Capital has not adequately disclosed the client trust account withdrawals to its clients.

5

22. AA Capital and Orecchio have attempted to conceal their misappropriations by characterizing them as "loans." However, Stevens has admitted that neither Orecchio nor AA Capital entered into loan agreements with AA Capital's clients reflecting the purported loans.

23. In addition, however AA Capital and Orecchio characterized the misappropriations from the client trust accounts, the withdrawals alleged above were not disclosed to AA Capital's clients as loans. Instead, AA Capital misrepresented the nature of the withdrawals to its clients by sending them monthly account statements that falsely characterized the withdrawals as "capital calls."

24. Stevens knew of the above misappropriations from their inception in 2004, as she was responsible for diverting client funds to AA Capital's operating account. Oliver learned of Orecchio's personal diversion of client funds in the summer of 2004.

25. Oliver, Stevens and Orecchio met in February 2006 to discuss AA Capital's financial condition and the need to reduce the firm's expenses. Oliver knew that AA Capital had misappropriated at least $5 million to cover operating expenses no later than February 2006. Oliver knew that Orecchio had diverted at least $5.7 million in client funds to himself no later than early 2006.

26. Thus far in 2006, Orecchio has submitted for payment by AA Capital more than $4.3 million in requests for reimbursement for travel and entertainment expenses. Such expenses have included $1 million for political contributions, hundreds of thousands of dollars for private plane rentals, and $120,000 to entertain clients at the Super Bowl. AA Capital is unable to determine which of these expenses can be charged to its clients because it does not have current books and records for 2006.

27. During 2006 and despite AA Capital's officers and directors' knowledge of the misappropriations of client funds alleged above and their knowledge of AA Capital's extremely poor financial condition, AA Capital has paid more than $2 million to payees designated by Orecchio,

6

purportedly in lieu of payment for some of his travel and entertainment expenses reimbursement. These payments include payments by AA Capital of more than $1 million to Lonyo and $610,000 to M & J.

28.    On August 31, 2006, and only after the Commission's staff raised with AA Capital the misappropriations set forth above, AA Capital suspended Orecchio and purportedly cut off his access to its clients' funds. According to Oliver, AA Capital suspended Orecchio based on its discovery of the above alleged misappropriation of client funds. However, Orecchio continues to own 50% of AA Capital, and also has an equity interest in its affiliated private equity funds. In addition, Oliver and Stevens continue to maintain their management positions at AA Capital.

29.    Thus far, neither AA Capital nor Orecchio have repaid the misappropriated funds to AA Capital's clients.

## COUNT I

### AA Capital's Violations of Section 206(1) of the Advisers Act

30.    Paragraphs 1 through 29 are realleged and incorporated by reference.

31.    AA Capital, an investment adviser, by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, employed a device, scheme, or artifice to defraud a client or prospective client.

32.    AA Capital acted knowingly or recklessly in connection with the above described conduct.

33.    By reason of the foregoing, AA Capital violated Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT II

### AA Capital's Violations of Section 206(2) of the Advisers Act

34.    Paragraphs 1 through 33 are realleged and incorporated by reference.

35.     AA Capital, an investment adviser, by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, engaged in a transaction, practice or course of business which operated as a fraud or deceit upon a client or prospective client.

36.     By reason of the foregoing, AA Capital violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT III

### AA Capital's Violations of Section 206(4) of the Advisers Act and Rule 206(4)-4 Thereunder

37.     Paragraphs 1 through 36 are realleged and incorporated by reference.

38.     AA Capital, an investment adviser, by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, engaged in an act, practice, or course of business which is fraudulent, deceptive and manipulative as those terms have been defined by the Commission by rules and regulations, including Advisers Act Rule 206(4)-4 [17 C.F.R. § 275.206(4)-4].

39.     AA Capital failed to disclose to its clients and prospective clients that its financial condition was and is reasonably likely to impair AA Capital's ability to meet its contractual commitment to its clients.

40.     By reason of the foregoing, AA Capital violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-4 thereunder [17 C.F.R. § 275.206(4)-4].

## COUNT IV

### AA Capital's Violations of Section 204 of the Advisers Act

41.     Paragraphs 1 through 40 are realleged and incorporated by reference.

42.     AA Capital, an investment adviser that makes use of the mails or of any means or instrumentality of interstate commerce in connection with its business as an investment adviser, failed to make or keep for prescribed periods such records (as defined in section 3(a)(37) of the Securities Exchange Act of 1934[15 U.S.C. § 78c]), furnish such copies thereof, and make and disseminate such reports as the Commission, by rule (including Advisers Act Rules 204-2(a)(1), 204-2(a)(2) and 204-2(a)(6) [17 C.F.R. §§ 275. 204-2(a)(1), 204-2(a)(2) and 204-2(a)(6)]), has prescribed as necessary or appropriate in the public interest or for the protection of investors.

43.     AA Capital, an investment adviser registered with the Commission, failed to make and keep true, accurate and current the following books and records relating to its investment advisory business:  (1) A journal or journals, including cash receipts and disbursements, records, and any other records of original entry forming the basis of entries in any ledger; (2) general and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts; and (3) all trial balances, financial statements, and internal audit working papers relating to the business of such investment adviser.

44.     By reason of the foregoing, AA Capital violated Section 206-4 of the Advisers Act [15 U.S.C. § 80 b-4] and Rules 204-2(a)(1), 204-2(a)(2) and 204-2(a)(6) thereunder [17 C.F.R. §§ 275. 204-2(a)(1), 204-2(a)(2) and 204-2(a)(6)].

## COUNT V

### Orecchio's Aiding and Abetting of
### AA Capital's Violations of Sections 206(1) and 206(2) of the Advisers Act

45.     Paragraphs 1 through 44 are hereby realleged and incorporated by reference herein.

46.     AA Capital, aided and abetted by Orecchio, and by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, employed a device, scheme, or artifice to

9

defraud a client or prospective client, engaged in a transaction, practice or course of business which operated as a fraud or deceit upon a client or prospective client.

47.     AA Capital, aided and abetted by Orecchio, and by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, engaged in a transaction, practice or course of business which operated as a fraud or deceit upon a client or prospective client.

48.     By reason of the foregoing, AA Capital violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

49.     Orecchio knowingly provided substantial assistance to AA Capital in the violations alleged above in paragraphs 30 to 36.

50.     By reason of the conduct alleged above, Orecchio aided and abetted AA Capital's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Find that defendant AA Capital violated Sections 204, 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1), 80b-6(2) and 80b-6(4)] and Rules 204-2(a)(1), 204-2(a)(2), 204-2(a)(6), and 206(4)-4 thereunder [17 C.F.R. §§ 275.204-2(a)(1), 275.204-2(a)(2), 275.204-2(a)(6)and 275.206(4)-4].

### II.

Find that defendant Orecchio aided and abetted AA Capital's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

10

## III.

Enter orders temporarily, preliminarily, and a final judgment permanently, restraining and enjoining defendant AA Capital and its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of such orders by personal service or otherwise, from, by use of the mails or any means of interstate commerce, directly or indirectly:

    (1)    employing any device scheme, or artifice to defraud any client or prospective client;

    (2)    engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client;

    (4)    engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative

in violation of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-4 [17 C.F.R. § 275.206(4)-4] promulgated thereunder. [17 C.F.R. § 275.206(4)-4]

## IV.

Enter orders temporarily, preliminarily, and a final judgment permanently, restraining and enjoining defendant Orecchio, and his agents, servants, employees, attorneys, and those persons in active concert or participation with him who receive actual notice of such orders by personal service or otherwise, from aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## V.

Enter an order that prevents defendants AA Capital and Orecchio, and each of defendants' financial institutions, officers, agents, servants, employees, attorneys, and those persons in active concert

or participation with defendants who receive actual notice of such order by personal service, facsimile service, service in accordance with any order of this Court, or otherwise, from withdrawing, transferring, selling, pledging, encumbering, assigning, dissipating, concealing or otherwise disposing of in any manner any funds, assets, accounts or other property belonging to, or directly or indirectly in the possession, custody or control of the defendants, or in which the defendants have a beneficial interest, wherever located.

## VI.

Enter an order prohibiting the defendants and their officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them from destroying, mutilating, concealing, altering or disposing of, in any manner, any of the books, records, or other documents belonging to, or directly or indirectly in the possession, custody or control of defendants, in whatever form, including electronic, and wherever located.

## VII.

Enter an order directing that each of the defendants file with this Court and serve upon the Commission within five (5) business days a verified written accounting, signed by the defendants, for: (1) all assets, funds and property received, directly or indirectly, from anyone who invested in AA Capital or any similar agreement, or otherwise gave, directly or indirectly, assets, funds or property to the defendants; (2) the amount of such funds or value of such assets; (3) the location of where such funds were put; (4) the uses to which such funds were put; and (5) the amounts of any remaining assets or funds and their location.

## VIII.

Enter an order appointing a receiver to marshal and preserve and manage the assets of defendant AA Capital.

## VIII.

Enter an order requiring defendants AA Capital and Orecchio to pay an appropriate civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## IX.

Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as may be necessary and appropriate.

Dated this 7th day of September, 2006.

Respectfully submitted,

John J Sikora, Jr., Ill. Bar No. 6217330
Robert M. Moye, Ill. Bar No. 6225688
Christopher S. Shearer, Ill. Bar No. 6243873
Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Boulevard
Suite 900
Chicago, Illinois 60604-2615
312-353-7390

# EXHIBIT B

$\mathcal{JH}$

FILED

JUN 2 9 2007

Jun 29 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| W. SCOTT PORTERFIELD, as Receiver for AA Capital Partners, Inc., ) | |
| ) | |
| Plaintiff, ) | Case No |
| ) | **07CV3654** |
| v. ) | **JUDGE GETTLEMAN** |
| ) | **MAG.JUDGE DENLOW** |
| JOHN A. ORECCHIO and ) | |
| PAUL W. OLIVER, JR., ) | |
| Defendants. ) | |

### COMPLAINT AND JURY DEMAND

W. Scott Porterfield, as the Receiver ("Receiver") for AA Capital Partners, Inc. ("AA Capital"), by his counsel, and pursuant to the authority granted him under the Order of this Court entered on September 13, 2006, effective as of September 11, 2006, for his Complaint against John A. Orecchio and Paul W. Oliver, Jr., alleges as follows:

### INTRODUCTION

1.    This action arises out of the misappropriation of millions of dollars of union pension fund, union retirement monies and union monies that were entrusted to AA Capital, an ERISA fiduciary and investment manager co-owned and managed by Defendants John A. Orecchio ("Orecchio") and Paul W. Oliver, Jr. ("Oliver"), AA Capital's sole directors and chief officers.

2.    Orecchio, AA Capital's president, director and co-owner, misappropriated tens of millions of dollars of AA Capital and investor funds for his personal benefit, using that money to, among other things: purchase and renovate his Michigan area horse farm; renovate a Detroit, Michigan strip club; purchase and renovate homes for himself, his girlfriend and others;

purchase jewelry and luxury automobiles (including two Bentleys and a Jaguar); and finance millions of dollars of extravagant travel and entertainment unrelated to any legitimate business activities of AA Capital. As a consequence of Orecchio's activities, AA Capital is now without the financial ability to satisfy tens of millions of dollars of claims of its defrauded investors.

3.    Orecchio's improper actions could have been stopped if defendant Oliver, AA Capital's co-owner, chairman, treasurer and director, exercised his fiduciary duties of due care, good faith and loyalty to oversee AA Capital's activities and to ensure that the funds of AA Capital and its clients were properly managed. While serving as a director and the treasurer of AA Capital, Oliver failed to monitor or review AA Capital's financial records or information, even a cursory review of which would have disclosed Mr. Orecchio's misappropriations. By abdicating his fiduciary obligations, Oliver enabled Orecchio's misappropriations to continue unchecked, resulting not only in the loss of millions of dollars of AA Capital's own assets, but also the loss of tens of millions of dollars of investor funds.

## PARTIES

4.    W. Scott Porterfield brings this action solely in his role as Receiver, not in his individual capacity. Mr. Porterfield is a citizen of the State of Illinois, and he resides in Chicago, Illinois.    On September 13, 2006, in the case of *United States Securities and Exchange Commission v. AA Capital Partners, Inc. and John Orecchio*, Case No. 06-C-04859 (the "SEC Action"), the United States District Court for the Northern District of Illinois entered an Agreed Order Appointing Receiver over AA Capital (the "Receiver Order").    AA Capital is a Delaware corporation with its principal place of business located in Chicago, Illinois, and it is a registered Investment Advisor under the Investment Advisors Act of 1940, as amended, and the rules and regulations promulgated thereunder (the "Investment Advisors Act").    Pursuant to the Receiver

Order, Mr. Porterfield was appointed receiver of all assets of AA Capital. On September 28, 2006, the United States District Court for the Northern District of Illinois entered an Order confirming that the Receiver has authority over certain investment funds managed by AA Capital.

5.      Orecchio is a citizen of the State of Illinois and, on information and belief, resides in Arlington Heights, Illinois. Orecchio was the president of AA Capital from the inception of AA Capital until his termination on or about August 31, 2006. Since the inception of AA Capital, Orecchio has been and continues to be one of the two shareholders and directors of AA Capital.

6.      Oliver is a citizen of the State of Illinois and, on information and belief, resides in Chicago, Illinois. Oliver was the chairman of the board of directors of AA Capital from the inception of AA Capital until his termination on September 22, 2006. Since the inception of AA Capital, Oliver has been and continues to be, one of the two shareholders and directors of AA Capital.

## JURISDICTION AND VENUE

7.      There are two independent bases for this Court's jurisdiction. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1132(e) because this action seeks civil enforcement under the Employee Retirement Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et seq.* This Court also has jurisdiction over this proceeding pursuant to 28 U.S.C. §1367 because this is an action brought by the Receiver appointed in the SEC Action and, as such, this action is ancillary to the SEC Action.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), both because all defendants reside in this District and because a substantial part of the events and omissions

giving rise to this claim occurred in this District. In addition, because this Court has ancillary jurisdiction pursuant to 28 U.S.C. §1367, this Court has ancillary venue under 28 U.S.C. §1391(b).

## BACKGROUND FACTS

A.    CREATION OF AA CAPITAL.

9.    Orecchio and Oliver formed AA Capital as a Delaware corporation in February 2002. Pursuant to AA Capital's by-laws, its affairs were to be managed by, and under the direction of, its two directors, Orecchio and Oliver.

10.    Orecchio and Oliver were the sole directors of AA Capital. Orecchio and Oliver were also officers of AA Capital. Orecchio was the president and secretary of AA Capital. Oliver was AA Capital's Chairman of the Board and treasurer.

11.    AA Capital is the "investment manager" for ERISA-governed union pension funds.

12.    AA Capital is a fiduciary as defined by §3(21) of ERISA (29 U.S.C. §1002(21)) both because it exercised discretionary authority and discretionary control over the management of the assets of ERISA-governed plans and because it rendered investment advice for a fee with respect to the assets of ERISA-governed plans managed by AA Capital.

13.    Orecchio and Oliver were also fiduciaries as defined by §3(21) of ERISA (29 U.S.C. §1002(21)) because they exercised discretionary authority and control over the assets of ERISA-governed plans managed by AA Capital.

14.    Orecchio and Oliver were aware, or should have been aware, virtually from the inception of AA Capital of their obligations of good faith, loyalty, due care and prudence to AA Capital and to the pension fund assets entrusted to it and of their fiduciary duties under ERISA.

15.     On March 1, 2002, Orecchio and Oliver entered into a Shareholders Agreement as the sole two shareholders and directors of AA Capital. Under this Shareholders Agreement, both Orecchio and Oliver agreed that books, records and accounts of all material operations and expenditures of AA Capital would be maintained and available for examination and copying by Orecchio and Oliver as shareholders of AA Capital.

16.     AA Capital is registered with the United States Securities and Exchange Commission (the "SEC") as an investment advisor under the Investment Advisors Act.

17.     As vehicles to invest the funds it received from clients, AA Capital caused the formation of at least three limited partnerships, described below, to receive the investor funds and then invest such funds in various debt and equity investments. Each AA Capital client that became an investor in a fund acquired a limited partnership interest in that fund.

**B.     AA CAPITAL'S INVESTOR CLIENTS.**

18.     AA Capital solicited six investor clients, each of which entered into an investment management agreement with AA Capital.

19.     AA Capital entered into an Investment Management Agreement dated August 19, 2002 with the Carpenters' Pension Trust Fund – Detroit & Vicinity (the "Carpenters' Fund") pursuant to which the Carpenters' Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the Carpenters' Fund to AA Capital. The Carpenters' Fund is an employee benefit plan as defined in §3(2) of ERISA (29 U.S.C. §1002(2)).  Pursuant to the Investment Management Agreement, AA Capital was appointed an "investment manager" for purposes of ERISA, and AA Capital acknowledged that it was a "fiduciary" within the meaning of ERISA. The Carpenters' Fund placed in excess of $75 million with AA Capital for investment under the

Investment Management Agreement.

20.     AA Capital entered into an Investment Management Agreement dated December 12, 2003 with the Operating Engineers Local No. 324 Pension Fund (the "Operators' Fund"), pursuant to which the Operators' Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the Operators' Fund to AA Capital. The Operators' Fund is an employee benefit plan as defined in §3(2) of ERISA (29 U.S.C. §1002(2)). Pursuant to the Investment Management Agreement, AA Capital was appointed an "investment manager" for purposes of ERISA, and AA Capital acknowledged that it was a "fiduciary" within the meaning of ERISA. The Operators' Fund placed in excess of $60 million with AA Capital for investment under the Investment Management Agreement.

21.     AA Capital entered into an Investment Management Agreement dated June 1, 2004 with the Michigan Teamsters Joint Council No. 43 Pension Fund (the "Teamsters' Fund"), pursuant to which the Teamsters' Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the Teamsters' Fund to AA Capital. The Teamsters' Fund is an employee benefit plan as defined in §3(2) of ERISA (29 U.S.C. §1002(2)). Pursuant to the Investment Management Agreement, AA Capital was appointed an "investment manager" for purposes of ERISA, and AA Capital acknowledged that it was a "fiduciary" within the meaning of ERISA. The Teamsters' Fund placed approximately $100,000 with AA Capital for investment under the Investment Management Agreement.

22.     AA Capital entered into an Investment Management Agreement in November 2004 with the Millwrights' Local No. 1102 Supplemental Pension Fund (the "Millwrights'

Fund"), pursuant to which the Millwrights' Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the Millwrights' Fund to AA Capital. The Millwrights' Fund is an employee benefit plan as defined in §3(2) of ERISA (29 U.S.C. §1002(2)).    Pursuant to the Investment Management Agreement, AA Capital was appointed an "investment manager" for purposes of ERISA, and AA Capital acknowledged that it was a "fiduciary" within the meaning of ERISA. The Millwrights' Fund placed more than $13 million with AA Capital for investment under the Investment Management Agreement.

23.    AA Capital entered into a QPAM Investment Management Agreement dated June 15, 2005 with the Michigan Regional Council of Carpenters Annuity Fund (the "MRCC Fund"), pursuant to which the MRCC Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the MRCC Fund to AA Capital. The MRCC Fund is an employee benefit plan as defined in §3(2) of ERISA (29 U.S.C. §1002(2)). Pursuant to the Investment Management Agreement, AA Capital was appointed a "Qualified Professional Asset Manager" for purposes of ERISA, and AA Capital acknowledged that it was an "investment manager" and "fiduciary" within the meaning of ERISA. The MRCC Fund placed in excess of $21 million with AA Capital for investment under the Investment Management Agreement.

24.    AA Capital entered into an Investment Management Agreement dated July 1, 2005 with the Arkansas/Oklahoma Regional Council of Carpenters (the "AR/OK Fund"), pursuant to which the AR/OK Fund retained AA Capital as its investment advisor and delegated to AA Capital full discretion over the investment and re-investment of all funds provided by the AR/OK Fund to AA Capital. Under the Investment Management Agreement AA Capital served

as a fiduciary of the AR/OK Fund. The AR/OK Fund placed in excess of $529,000 with AA Capital for investment under the Investment Management Agreement.

## C.    AA CAPITAL'S SPONSORED FUNDS.

25.    AA Capital, directly and through its officers and senior employees created several investment funds, including: (i) AA Capital Equity Fund, L.P. (f/k/a AA Diversified Private Equity Fund L.P.) ("Fund I"); (ii) AA Capital Equity Fund II, L.P. (f/k/a AA Capital Liquidity Fund L.P.) ("Fund II"); and (iii) Brush Monroe Partners, L.P. ("Brush Monroe Fund") (collectively, the "Funds").

26.    Each of the Funds was set up as a Delaware limited partnership, with the client investors of AA Capital receiving the limited partnership interests for their investments. Each of the Funds/limited partnerships had a general partner that was a Delaware limited liability company. The members of the general partners were officers and employees of AA Capital. The general partners were managed by managing members which, for each Fund, included Orecchio and, for Fund I, included Oliver.

### (1)    FUND I

27.    In August 2002, AA Capital created Fund I as a Delaware limited partnership. The general partner of Fund I is AA Capital Equity Fund LLC, a Delaware limited liability company. The managing members of that limited liability company include Orecchio and Oliver. The general partner of Fund I received a one percent economic interest in the Fund for which it made no payment.

28.    The limited partners/investors of Fund I received 99% of the economic interest in the Fund. The limited partners are the Carpenters' Fund, the Operators' Fund, and the Teamsters' Fund. The limited partners were placed in Fund I by AA Capital, pursuant to

authority purportedly granted to it under the respective investment management agreements of the investors. AA Capital caused the limited partners to commit over $192 million cash into Fund I.

29.    AA Capital was retained to manage the investments and business of Fund I under a Management Agreement dated July 1, 2002 (the "Fund I Management Agreement"). Pursuant to that Agreement, AA Capital served as Fund I's investment manager as defined by Section 3(38) of ERISA, and AA Capital acknowledged that it was a fiduciary within the meaning of ERISA with respect to the assets of Fund I. AA Capital was granted full discretion over the investments and, if applicable, re-investments of Fund I's assets. AA Capital's professional services under the Fund I Management Agreement include, but are not limited to, ensuring that the money of the Fund I limited partners was properly maintained, monitored, segregated and accounted for, was not commingled into the accounts of AA Capital or other funds under AA Capital management, and was used only for authorized purposes, which purposes were limited to funding the investments in Fund I and paying legitimate expenses and management fees. Under the Fund I Management Agreement, AA Capital was also obligated to, among other things, conduct due diligence into the potential investments.

30.    The Fund I limited partnership agreement contains a waterfall provision that specifies how the proceeds from the Fund I investments are to be distributed. Under the waterfall provision, after the limited partners recover their full contributions to the Fund plus a preferred return on the contribution, the general partner is entitled to receive a percentage of any remaining profit (the "Fund I Carried Interest"). As members of the general partner of Fund I, Orecchio and Oliver will share in the Fund I Carried Interest if sufficient profits are earned on Fund I's investments.

31.    The investments of Fund I consist of investments in eleven "Funds of Funds" and in five private equity direct investments.

   **(2)    FUND II.**

32.    In January 2005, AA Capital created Fund II as a Delaware limited partnership. The general partner of Fund II is AA Private Equity Investors Management II, LLC, a Delaware limited liability company. The managing members of that limited liability company include Orecchio. The general partner of Fund II received a one percent economic interest in the Fund for which it made no payment.

33.    The limited partners/investors of Fund II received 99% of the economic interest in the Fund. The limited partners are the MRCC Fund, the Millwrights' Fund, and the AR/OK Fund. The limited partners were placed in Fund II by AA Capital, pursuant to authority purportedly granted to it under the respective investment management agreements of the investors. AA Capital caused the limited partners to commit over $18 million into Fund II.

34.    AA Capital was retained to manage the investments and business of Fund II under a Management Agreement dated November 1, 2004 (the "Fund II Management Agreement"). Pursuant to that Agreement, AA Capital served as Fund II's investment manager as defined by Section 3(38) of ERISA and acknowledged that it was a fiduciary within the meaning of ERISA with respect to the assets of Fund II. AA Capital was granted full discretion over the investments and, if applicable, re-investments of Fund II's assets. AA Capital's professional services under the Fund II Management Agreement include, but are not limited to, ensuring that the money of the Fund II limited partners was properly maintained, monitored, segregated and accounted for, was not commingled into the accounts of AA Capital or other funds under AA Capital management and was used only for authorized purposes, which purposes were limited to funding

the investments in Fund II, and paying legitimate expenses and management fees. Under the Fund II Management Agreement, AA Capital was also obligated to, among other things, conduct due diligence into the potential investments.

35.    The Fund II limited partnership agreement contains a waterfall provision that specifies how the proceeds from the Fund II investments are to be distributed. Under the waterfall provision, after the limited partners recover their full contributions to the Fund plus a preferred return on the contributions, the general partner is entitled to receive a percentage of any remaining profit (the "Fund II Carried Interest"). As a member of the general partner of Fund II, Orecchio will share in the Fund II Carried Interest if there are sufficient profits from Fund II's investments.

36.    The investments of Fund II consist of direct investments in the form of real estate loans or equity investments for five real estate projects, including a loan to AART Development LLC, which was to be a joint venture between Fund II and Rick Tabbi Development Company to finance a real estate development in Macomb County, Michigan.

(3)    **THE BRUSH MONROE FUND.**

37.    In March 2006, AA Capital established the Brush Monroe Fund as a Delaware limited partnership. The general partner of the Brush Monroe Fund is Brush Monroe General Partner LLC, a Delaware limited liability company. The managing members of that limited liability company include Orecchio. The general partner of the Brush Monroe Fund received a one percent economic interest in the Fund for which it made no payment.

38.    The limited partners/investors of the Brush Monroe Fund received 99% of the economic interest in the Fund. The limited partners are the Carpenters' Fund and the Operators' Fund. The limited partners were placed in the Brush Monroe Fund by AA Capital, pursuant to

authority purportedly granted to it under the respective investment management agreements of the investors. AA Capital caused the limited partners to invest over $31 million cash into the Brush Monroe Fund.

39.     AA Capital was retained to manage the investments and business of the Brush Monroe Fund, although there is no signed Management Agreement between AA Capital and the Fund. AA Capital has nonetheless managed the affairs of the Brush Monroe Fund in the same manner as it has managed the affairs of Fund I and Fund II.

40.     Brush Monroe Fund's sole business activity was investing in, as a lender and equity holder, Xyience Incorporated ("Xyience"), a Nevada corporation. Brush Monroe Fund's investment in Xyience was approximately $32.6 million. Brush Monroe Fund's investment in Xyience was funded primarily with that portion of the proceeds of Fund I's investment in Premier Entertainment Biloxi LLC allocated to the Carpenters' Fund and the Operators' Fund, as investors in Fund I.

**D.     DAILY OPERATION OF AA CAPITAL.**

41.     When each of the investors became a client of AA Capital, the investor deposited the total amount of its investment commitment with AA Capital. AA Capital set up and maintained bank trust accounts (the "Investor Trust Accounts") for each investor to hold such monies until such time as when a fund in which AA had placed the investor required money to meet an investment commitment or other cash flow needs.

42.     Under the Management Agreements, the Funds could call capital from the Investor Trust Accounts for three primary purposes:

     a.   investments by the Funds;

     b.   management fees; or

c.  overhead expenses attributable to the particular Fund.

43.    Oliver, as a director and officer of AA Capital, had an obligation to ensure that capital was called from the Investor Trust Accounts only for proper investment purposes as authorized by the management agreements and as appropriate for a fiduciary under ERISA. However, Oliver failed to satisfy this obligation, enabling Orecchio to misappropriate funds belonging to AA Capital and its investors.

E.    **BREACHES OF FIDUCIARY DUTY BY ORECCHIO AND OLIVER: ORECCHIO'S MISAPPROPRIATION OF ASSETS.**

44.    As directors and co-owners of AA Capital, an SEC registered investment advisor, and as fiduciaries under ERISA, Oliver and Orecchio had obligations to implement adequate internal controls over the business and financial operations of AA Capital and the funds it managed. Internal controls were also required to enable AA Capital's officers, directors, clients and the SEC to have accurate information regarding the financial condition of AA Capital, including, but not limited to, maintaining accurate financial books and records, the ability to track the funding of investments, accurately monitor capital calls, account receivables and payables, and track cash flow.

45.    Defendants Oliver and Orecchio, in their capacities as directors and officers of AA Capital, breached these fiduciary duties by recklessly failing to institute adequate internal controls, even though such duties are imposed by law and even though Oliver and Orecchio had created and adopted a Shareholders Agreement, a Code of Ethics and an AA Capital Compliance Manual which required them to install such controls.

46.    The failure of Orecchio and Oliver to implement and maintain adequate internal controls facilitated Orecchio's misappropriation of investor funds. Because of Oliver's failure to exercise any supervisory control, Oliver failed to stop Orecchio from engaging in such activities.

47.    Orecchio's misappropriations were accomplished in large part by manipulating capital calls to the investors in Fund I, Fund II and the Brush Monroe Fund. Orecchio would instruct AA Capital's Chief Financial Officer, Mary Beth Stevens ("Stevens"), to make capital calls on the Investor Trust Accounts. While certain capital calls were made for the purposes authorized by the Management Agreements, Orecchio instructed Stevens to make capital calls that enabled him to misappropriate for his personal use tens of millions of dollars belonging to the investors in Fund I, Fund II and the Brush Monroe Fund.

48.    Oliver, a director and the treasurer of AA Capital, failed to monitor or review AA Capital's financial records or information, or to supervise or monitor Stevens. Had he done so, Oliver would have recognized the financial improprieties and blatant financial mismanagement that enabled Orecchio to misappropriate company and investor funds.

49.    As a result of Oliver's abdication of his fiduciary duties, Orecchio was able to misappropriate approximately $10.12 million of investor funds by fabricating and inflating capital calls to the investors in Fund I, Fund II and the Brush Monroe Fund. These capital calls were excessive, unwarranted, did not serve any legitimate business purpose, and did not benefit AA Capital or the funds it managed.

50.    There is a second category of loss that resulted from Oliver's abdication of his fiduciary duties. Orecchio was able to direct that AA Capital, as manager of Fund I and Fund II, draw by capital calls in excess of $10.38 million from the Investor Trust Accounts of the investors in those Funds for which there was no legitimate investment or business purpose and which did not benefit AA Capital or the funds it managed, including, but not limited to, the following:

a.   **Capital Calls for Purported Tax Payments.**   In 2004 and 2005, Orecchio directed that AA Capital, as manager of Fund I and Fund II, draw by capital calls $5.721 million from the Investor Trust Accounts of the investors of those Funds for Orecchio's purported personal "tax payments." Had Oliver been exercising his fiduciary duty, he would have recognized that Orecchio's purported tax payments were not a legitimate investment expense and had no legitimate business purpose, but rather constituted a misappropriation of the money belonging to the investors. Orecchio misappropriated the monies characterized as "tax payments" for his personal use as follows:

(i)    $20,000 was deposited into the bank account of J&R Ventures, LLC ("J&R Ventures") in which Orecchio and his business associate Joseph R. Jewett ("Jewett") had an interest. Orecchio became one of the signatories on the J&R Ventures bank account and used the monies in the J&R Ventures bank account for his personal benefit;

(ii)   $5.199 million was deposited into Orecchio's personal bank account;

(iii)  $263,000 was deposited into the bank account of Lonyo LLC, which was an entity Orecchio created to renovate and operate the Crazy Horse strip club located in Detroit, Michigan; and

(iv)   $239,000 was deposited into the bank account of M&J Animal Rescue, which monies were used for the operation of Orecchio's horse farm and to fund personal expenses.

b.   **Capital Calls for Payments to J&R Ventures and Jewett.** In addition, between 2002 and 2006, Orecchio directed that AA Capital pay, from funds withdrawn from the Investor Trust Accounts, approximately $4.359 million to J&R Ventures and Jewett. Over $3 million of that amount was paid to J&R Ventures, an entity Orecchio controlled, which Orecchio then misappropriated such monies for his personal use, including, but not limited to, the following:

(i)     Orecchio wrote checks payable to himself totaling $955,000.

(ii)    Orecchio wrote checks payable to cash totaling $276,000.

(iii)   Orecchio wrote checks payable to his American Express account totaling $520,618.01.

(iv)    Orecchio wrote checks payable to M&J Animal Rescue totaling $245,000.

(v)     Orecchio wrote checks payable to Lonyo LLC, his entity that operated the Crazy Horse strip club, to Mannecorp LLC, the entity that owns the Crazy Horse, and to Thomas Moses, the managing member of Mannecorp LLC, totaling $629,000.

(vi)    Orecchio wrote checks payable to Necker Island BVI and Caribbean Way totaling $365,520 for the 2005 and 2006 trips to Necker Island, the island owned by Sir Richard Branson, which represented the costs of travel, food and lodging for Orecchio, his girlfriend Marley Powers, and friends to celebrate Ms. Powers' birthday.

(vii)   Orecchio wrote checks totaling $426,121 payable to the Morgan Group for the construction of a barn on Orecchio's Michigan horse farm and for the renovation of the Crazy Horse strip club.

(viii)  Orecchio wrote a check for $75,000 payable to Iceland Explore as a deposit for a vacation to Iceland scheduled for himself and Marley Powers.

(ix)    Orecchio wrote a check for $40,000 payable to Mandalay Bay for personal expenses he incurred at that Las Vegas, Nevada resort and casino.

(x)     Orecchio wrote a check for $20,000 payable to Independent Investment Management, LLC ("IIM"), an entity in which Orecchio's business associate, Joseph Caretti, had an interest and to which Orecchio directed AA Capital to pay $1.14 million, as discussed below.

(xi)    Orecchio wrote a check for $1 million payable to AA Capital dated July 26, 2006, supposedly as a partial repayment of the $5.7 million he had directed AA Capital to pay for purported tax payments, because the SEC had raised questions concerning the purported tax payments.

51.     Additionally, as a result of Oliver's abdication of his fiduciary duties, Orecchio was able to use Fund II's investment in AART Development LLC ("AART") as a means to misappropriate for his personal use approximately $7.4 million of the money belonging to the investors in Fund II. Between approximately August 31, 2005 and July 31, 2006, Orecchio

directed AA Capital to make seven capital calls to the Fund II investors of approximately $8.7 million to fund the investment by Fund II in AART. However, only approximately $1.325 million of those funds were actually invested into or for the ostensible benefit of AART. The balance, approximately $7.4 million of the $8.7 million "investment" in AART, was misappropriated by Orecchio for his personal benefit. In particular:

      a.      Orecchio diverted $6.9 million to the Morgan Group to pay for the renovations of the Crazy Horse strip club and of Orecchio's Detroit area horse farm.

      b.      Orecchio diverted $505,000 to Chicago Title to fund the purchase of a Las Vegas, Nevada condominium for Orecchio; however, Chicago Title subsequently refunded the $505,000 deposit to Orecchio when that real estate transaction did not close.

**F.**    **BREACHES OF FIDUCIARY DUTY BY ORECCHIO AND OLIVER:**
       **ORECCHIO'S EXTRAVAGANT AND FRAUDULENT EXPENSE REIMBURSEMENTS.**

52.    In addition to Orecchio's misappropriation of money, as a result of Oliver's abdication of his fiduciary duties, Orecchio was able, between 2002 and September 2006, to submit to AA Capital requests of $9.935 million for reimbursement of purported business expenses, and to direct AA Capital to either reimburse him for all such amounts or that AA Capital pay vendors or credit card bills directly on behalf of Orecchio.

53.    Among the supposed "business" expenses for which Orecchio sought and obtained reimbursement are the following:

      a.      Orecchio sought and received reimbursement of $1.150 million for political donations, including a $500,000 donation to the Citizens for Greater Detroit, a $500,000 donation to the Michigan Democrats, and a $150,000 donation to the Michigan Democratic State Central Committee, without submitting any back-up for such expenses. In fact, there are no such entities so named, nor were such contributions actually made. Rather, such purported contributions were an artifice to enable Orecchio to misappropriate AA Capital's funds. Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

b.  Orecchio sought and received reimbursement of approximately $1.7 million for chartering private airplanes, which were used for personal travel for Orecchio, his girlfriend Marley Powers, friends and, on occasion, Orecchio's wife and children, and which had no legitimate business purpose.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

c.  Orecchio sought and received reimbursement of approximately $2.5 million for sporting events and concerts attended by himself, his girlfriend Marley Powers, friends and, on occasion, Orecchio's wife and children, and which had no legitimate business purpose.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

d.  Orecchio sought and received reimbursement of $1.425 million for meals and entertainment most, if not all, of which was for himself, his girlfriend Marley Powers, and friends, and which had no legitimate business purpose.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

e.  Orecchio sought and received reimbursement of over $110,000 for Rock for Kids charities, which he used to purchase sporting and rock and roll memorabilia for his personal use.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

f.  Orecchio sought and received reimbursement of over $600,000 for lodging, most, if not all, of which was for himself, his girlfriend Marley Powers, and friends, and which had no legitimate business purpose.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

g.  Orecchio directed that $2.07 million be wired to the M&J Animal Rescue account, which monies were used to operate Orecchio's horse farm.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

h.  Orecchio directed that $1.942 million be wired to the Lonyo LLC account, which monies were used for the operation of the Crazy Horse strip club.  Such misappropriations were the direct result of Oliver's failure to exercise his fiduciary duty to oversee and monitor the activities of AA Capital and to examine AA Capital's books and records.

54.     Not only were such purported expenses inappropriate and for no business purpose, but they were far in excess of what AA Capital could afford. Orecchio's purported business expenses for 2002, 2003 and 2004 ranged from approximately one-third to one-half of AA Capital's total revenue. Orecchio's purported business expenses for 2005 and the first six months of 2006 actually exceeded AA Capital's revenue. Oliver, however, failed to make even a rudimentary examination of AA Capital's books and records, which would have disclosed Orecchio's exorbitant and improper expenses.

**G.     BREACHES OF FIDUCIARY DUTY BY ORECCHIO AND OLIVER:
THE ESTABLISHMENT OF AND PAYOUT TO THE CO-INVESTMENT FUND.**

55.     In March 2004, AA Capital established AA Capital Biloxi Co-Investment Fund, L.P. (the "Co-Investment Fund") as a secondary investment offering related to the Biloxi Hard Rock Casino. The limited partners in the Co-Investment Fund consisted of certain individuals and entities, including J&R Ventures, Oliver and Orecchio, among others. Although Orecchio and Oliver made no investment contribution to the Co-Investment Fund, the other limited partners invested a total of $1.14 million. Fund I assigned to the Co-Investment Fund approximately $11.4 million (cost basis) of Fund I's investment in the Biloxi Hard Rock project, with Fund I retaining an investment of approximately $38.6 million (cost basis).

56.     In April 2006, Fund I and the Co-Investment Fund sold their interest in the Biloxi Hard Rock for approximately $89 million. Virtually all of the expenses of the Biloxi Hard Rock Project were allocated to Fund I and approximately $3 million of profit was paid out to the limited partners of the Co-Investment Fund. Orecchio received $530,720 and Oliver received $197,088 as a result of their investment in the Co-Investment Fund.

57.     On information and belief, Orecchio and Oliver failed to exercise their fiduciary duties of loyalty and due care in the establishment of the Co-Investment Fund, the allocation of

expenses disproportionally to Fund I, in the assignment of the cost bases between Fund I and the Co-Investment Fund, and in the payout of cash distribution to the Co-Investment Fund limited partners.

**H.    BREACHES OF FIDUCIARY DUTY BY ORECCHIO AND OLIVER: IMPRUDENT INVESTMENT IN XYIENCE.**

58.    Although the Fund I Investment Management Agreement vested AA Capital with full discretion over the investment and re-investment of all funds provided to AA Capital for management under that Agreement, Orecchio and Oliver, as AA Capital's directors and officers, owed fiduciary obligations to AA Capital's investment clients to ensure that the assets of the Fund I investors were invested prudently.

59.    AA Capital's obligations under the Fund I Investment Management Agreement and under ERISA include, but are not limited to, conducting appropriate due diligence into investments and re-investments made on behalf of the Fund I Limited Partners, taking all appropriate steps to minimize risk and safeguard the investments made on behalf of the Fund I Limited Partners, and taking all appropriate steps to ensure that the investments made on behalf of the Fund I Limited Partners were appropriate for union pension funds, which were the Fund I investors.

60.    Orecchio and Oliver, as directors and as "fiduciaries" under ERISA, also owed a fiduciary duty to AA Capital and the Fund I investors to administer the corporate affairs for the benefit of AA Capital and the investors, and to exercise their best care, skill and judgment in the best interest of AA Capital and the Fund I investors.

61.    Among the investments in Fund I was Premier Entertainment Biloxi LLC ("Premier Entertainment"), which was a private equity investment to develop a Hard Rock Casino in Biloxi, Mississippi.    The Limited Partners of Fund I invested approximately $38

million in Premier Entertainment Biloxi LLC. When that investment was sold on or about April 30, 2006, there was a distribution to the Fund I Limited Partners, representing a gross profit (before expenses and management fees) of approximately $28.9 million.

62.     Instead of paying out or appropriately re-investing the profit belonging to the Fund I Limited Partners from the Premier Entertainment investment, Orecchio re-invested such profit in a risky and inappropriate investment, without conducting adequate due diligence for that investment.

63.     Specifically, Orecchio created the Brush Monroe Fund solely to invest the proceeds of the Premier Entertainment investment allocated by Fund I to the Carpenters' Fund and the Operators' Fund into a series of investments in Xyience. The Xyience investments by the Brush Monroe Fund occurred between March 31, 2006 and September 5, 2006 and were made on terms and conditions unduly favorable to Xyience. Xyience is a start-up company that markets energy and weight-loss drinks and supplements. At the time that Orecchio decided to roll the Fund I profits into the Brush Monroe Fund for the purpose of investing in Xyience, the founder, president and largest shareholder of Xyience was Russell Pike, who has been convicted twice of felonies including money laundering and bank fraud. The total of the Carpenters' Fund and the Operators' Fund investment in Xyience, through the Brush Monroe Fund, is approximately $31 million.

64.     The Xyience investment took the form of both the purchase, for approximately $21 million, of common stock and the making of a $10 million loan secured by the assets of Xyience. The loan's maturity date was September 2006.

65.     On information and belief, Orecchio conducted minimal and inadequate due diligence into Xyience. On information and belief, Oliver exercised no supervisory control over

the decision to re-invest into Xyience the proceeds that the Carpenters' Fund and the Operators'
Fund realized from the liquidation of the Premier Entertainment investment. Not only did Oliver
fail to reasonably inform himself about Xyience, he failed to take any active role to ensure that
Fund I's proceeds from the Premier Entertainment sale were re-invested in a manner that was
safe, prudent and appropriate for the Fund I limited partners.

66.     Not only was the Xyience investment unsafe and imprudent, it was inappropriate
to invest union pension fund monies into an entity controlled by a convicted felon.

67.     In September 2006, Xyience informed the Brush Monroe Fund that it was unable
to repay the principal on the $10 million secured loan. The Receiver determined that Xyience
had over $3 million in secured debt that was senior to the Brush Monroe Fund loan to Xyience.
Recently, the Brush Monroe Fund sold its note and all but 2.5 million shares of its equity interest
in Xyience for $9 million. At this time, there is no market for the Brush Monroe Fund's
remaining 2.5 million shares in Xyience.

## COUNT I
### (VIOLATION OF SECTION 404(A)(1) OF ERISA:
### AGAINST ORECCHIO)

68.     The Receiver realleges and incorporates by reference paragraphs 1 through 67
above as paragraph 68 of this Complaint.

69.     AA Capital, as the manager of ERISA-governed funds, is a fiduciary within the
meaning of Section 3(21) of ERISA, 29 U.S.C. §1002. The Receiver brings this Count under
§502(a)(3)(B) of ERISA to redress violations of ERISA by Orecchio.

70.     Orecchio, as one of the corporate officers and directors who carried out the
fiduciary functions of AA Capital, is himself a fiduciary as defined under Section 3(21) of
ERISA because he exercised discretionary authority and control over the assets of the ERISA-

governed plans managed by AA Capital.

71.    Orecchio had a duty under Section 404(a)(1)(B) of ERISA to ensure that AA Capital and its employees acted solely in the interests of the ERISA-governed plans managed by AA Capital and the beneficiaries thereof, and with reasonable care, skill, prudence and diligence, in light of the special nature and purpose of employee benefit plans.

72.    Orecchio breached these duties by acting in his own personal interest in causing AA Capital to divert and misappropriate the assets of its investment clients for Orecchio's own personal benefit, as described above and in particular in paragraphs 49 through 54.

73.    Orecchio further breached these duties by failing to protect the interests of the plan participants who were the limited partners in the Brush Monroe Fund by causing the Brush Monroe Fund to make an imprudent investment in Xyience without the proper exercise of reasonable care, skill, prudence and diligence in light of the special nature and purpose of employee benefit plans.

74.    By his actions and failures to act, Orecchio did not act with the care, skill, prudence and diligence that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of §404(a)(1)(B) of ERISA, 29 U.S.C. §1104(a)(1)(B).

75.    As a result of such breaches, Orecchio has caused the ERISA-governed plans managed by AA Capital to suffer financial losses for which Orecchio is liable pursuant to §409(a) of ERISA, 29 U.S.C. §1109(a). Accordingly, Orecchio is required, *inter alia,* to make good to the ERISA-governed plans managed by AA Capital for all losses resulting from such breaches, and to restore to the ERISA-governed plans managed by AA Capital any profits made through Orecchio's use of such plan assets.

## COUNT II
### (VIOLATION OF SECTION 406(A)(1)(D) OF ERISA:
### AGAINST ORECCHIO)

76.    The Receiver realleges and incorporates by reference paragraphs 1 through 75 above as paragraph 76 of this Complaint.

77.    AA Capital, as the manager of ERISA-governed funds, is a "fiduciary" within the meaning of Section 3(21) of ERISA.   The Receiver brings this Count under §502(a)(3)(B) of ERISA to redress violations of ERISA by Orecchio.

78.    Orecchio, as one of the corporate officers and directors who carried out the fiduciary functions of AA Capital, is himself a fiduciary as defined under Section 3(21) of ERISA because he exercised discretionary authority and control over the assets of the ERISA-governed plans managed by AA Capital.

79.    Orecchio was a "party in interest" within the meaning of Section 3(14)(a) of ERISA (29 U.S.C. §1002(14)(a)) with respect to the investor clients of AA Capital and the assets of the clients managed by AA Capital.

80.    Orecchio had a duty under Section 406(a)(1)(B) of ERISA not to cause any of the ERISA-governed plans managed by AA Capital to engage in transactions that he knew or should have known constituted a direct or indirect lending of money or other extension of credit between Orecchio, as a party in interest, and the ERISA-governed plans managed by AA Capital.

81.    Orecchio breached Section 406(a)(1)(B) of ERISA by engaging in transactions that he knew or should have known constituted a direct or indirect lending of money or other extension of credit between Orecchio, as a party in interest, and the ERISA-governed plans managed by AA Capital.

82.    Orecchio had a duty under Section 406(a)(1)(D) of ERISA not to transfer or use

for his own benefit any assets of the ERISA-governed plans managed by AA Capital.

83.     Orecchio breached Section 406(a)(1)(D) of ERISA by transferring for his own benefit and using assets of the ERISA-governed plans managed by AA Capital, as described above and in particular in paragraphs 49 through 54.

84.     As a result of such breaches, Orecchio has caused the ERISA-governed plans managed by AA Capital to suffer financial losses for which Orecchio is liable pursuant to §409(a) of ERISA, 29 U.S.C. §1109(a). Accordingly, Orecchio is required, *inter alia,* to make good to the ERISA-governed plans managed by AA Capital for any losses resulting from such breaches, and to restore to the ERISA-governed plans managed by AA Capital any profits which have been made through Orecchio's use of such plan assets.

## COUNT III
### (VIOLATION OF SECTION 406(B) OF ERISA:
### AGAINST ORECCHIO)

85.     The Receiver realleges and incorporates by reference paragraphs 1 through 84 above as paragraph 85 of this Complaint.

86.     AA Capital, as the manager of ERISA-governed funds, is a "fiduciary" within the meaning of Section 3(21) of ERISA. The Receiver brings this Count under §502(a)(3)(B) of ERISA to redress violations of ERISA by Orecchio.

87.     Orecchio, as one of the corporate officers and directors who carried out the fiduciary functions of AA Capital, is himself a fiduciary as defined under Section 3(21) of ERISA because he exercised discretionary authority and control over the assets of the ERISA-governed plans managed by AA Capital.

88.     Orecchio was prohibited under Section 406(b)(1) of ERISA (29 U.S.C. §1106) from dealing with the assets of the ERISA-governed plans managed by AA Capital in his own

interest or for his own account.

89.    Orecchio breached Section 406(b)(1) of ERISA by dealing with the assets of the ERISA-governed plans managed by AA Capital in his own interest or for his own account, as described above and in particular in paragraphs 49 through 54.

90.    As a result of such breaches, Orecchio has caused the ERISA-governed plans managed by AA Capital to suffer financial losses for which Orecchio is liable pursuant to §409(a) of ERISA, 29 U.S.C. §1109(a).  Accordingly, Orecchio is required, *inter alia*, to make good to all the ERISA-governed plans managed by AA Capital for any losses resulting from such breaches, and to restore to the ERISA-governed plans managed by AA Capital any profits which have been made through Orecchio's use of such plan assets.

## COUNT IV
### (VIOLATION OF SECTION 405(A)(2) OF ERISA: AGAINST OLIVER)

91.    The Receiver realleges and incorporates by reference paragraphs 1 through 90 above as paragraph 91 of this Complaint.

92.    AA Capital, as the manager of ERISA-governed funds, is a "fiduciary" within the meaning of Section 3(21) of ERISA.  The Receiver brings this Count under §502(a)(3)(B) of ERISA to redress violations of ERISA by Oliver.

93.    Oliver, as one of the corporate officers and directors who carried out the fiduciary functions of AA Capital, is himself a fiduciary as defined under Section 3(21) of ERISA (29 U.S.C. §1002) because he exercised discretionary authority and control over the assets of the ERISA-governed plans managed by AA Capital.

94.    As a fiduciary for AA Capital's investor clients and of the plan assets they had placed with AA Capital, Oliver had specific duties under Section 404(a)(1) of ERISA, including

duties to insure that (i) AA Capital and Orecchio discharged their fiduciary duties for the exclusive purpose of providing benefits to ERISA-governed plans managed by AA Capital and (ii) AA Capital and Orecchio exercised care, skill, and diligence in handling the assets of ERISA-governed plans managed by AA Capital.

95.     Oliver, by his lack of attention and lack of diligence, failed to comply with his duties under Section 404(a)(1) of ERISA and, consequently, he enabled Orecchio to commit the breaches of fiduciary duty and other violations of ERISA described above and in particular in paragraphs 49 through 54.

96.     By his conduct and his lack of action, Oliver is liable under Section 405(a)(2) of ERISA (29 U.S.C. §1105(a)(2)) for the losses that the ERISA-governed plans managed by AA Capital suffered as a result of Orecchio's misconduct.

97.     Accordingly, pursuant to §409(a) of ERISA (29 U.S.C. §1109(a)), Oliver is required, *inter alia,* to make good to the ERISA-governed plans managed by AA Capital for any losses resulting from such breaches, and to restore to the ERISA-governed plans managed by AA Capital any profits which have been made through Orecchio's use of such plan assets.

### COUNT V
### (BREACH OF FIDUCIARY DUTY:
### BREACH OF THE DUTY OF CARE AGAINST OLIVER)

98.     The Receiver realleges and incorporates by reference paragraphs 1 through 97 above as paragraph 98 of this Complaint.

99.     As a director and officer of AA Capital, Oliver owed AA Capital a duty of care to protect the interests of AA Capital, which interests were to ensure that AA Capital properly met its obligations as a fiduciary under ERISA and as an SEC registered investment advisor and to otherwise safeguard the assets and minimize the liabilities of AA Capital. Oliver owed AA

Capital and its investors the duties:  (a) to be reasonably informed about the financial affairs of

AA Capital and about the investments made by AA Capital on behalf of its clients; (b) to ensure

that all such investments were prudent and appropriate; (c) to monitor such investments and the

handling of the client trust accounts; and (d) to take an active and direct role in the management

of the affairs of AA Capital.

100.    Also, in his capacity as treasurer of AA Capital, Oliver owed AA Capital a

fiduciary duty of care:  (a) to directly oversee the financial books and records of AA Capital; (b)

to take an active and informed role to make certain the clients' trust accounts were properly

managed and used only for authorized and appropriate investment purposes; and (c) to ensure

that there was no mismanagement or misappropriation of such funds.

101.    Oliver breached the fiduciary duty of care he owed to AA Capital in his capacity

as a director and officer of AA Capital by, among other things:  (a) failing to institute adequate

internal controls over the finances of AA Capital; (b) failing to conduct even a rudimentary

review of the readily available financial books and records of AA Capital; (c) failing to keep

himself informed about the financial affairs of, and investments made by, AA Capital; and (d)

failing to take an active and direct role in the management of AA Capital.

102.    As a result of Oliver's breaches of his duty of care, Orrechio was able to

misappropriate millions of dollars of the assets of AA Capital's investment-advisory clients for

his personal benefit, including, but not limited to, the following:

    a. Orecchio misappropriated an amount in excess of $10.12 million of client
      assets entrusted to AA Capital by fabricating and inflating capital calls to
      the limited partners of Fund I and Fund II;

    b. Orecchio misappropriated, by directing capital calls on the client trust
      accounts of the Fund I and Fund II limited partners, an additional amount
      in excess of $10.38 million of client assets entrusted to AA Capital for
      which there was no legitimate purpose, but which were classified as "tax
      payments" or were payments to entities such as J&R Ventures, in which

Orecchio had an interest; and

c.    Orecchio misappropriated for his personal use and benefit $7.4 million of client assets entrusted by the Fund II limited partners to AA Capital for the Fund II investment in AART.

103.    Additionally, as a result of Oliver's breach of his duty of care, Orrechio was able to misappropriate at least $9.9 million of client assets in the guise of purported expense reimbursements, which monies were used to fund, among other things: personal travel and entertainment for Orecchio, his girlfriend, friends, his wife and other family members; the construction and operation of Orecchio's Detroit area horse farm; and the renovation and operation of a strip club located in Detroit.

104.    Oliver failed to inform himself regarding the Co-Investment Fund. As a consequence of Oliver's breach of his duty of care, Orecchio improperly established the Co-Investment Fund as a means for Orecchio and his friends and business associates to enjoy the anticipated profit from Fund I's investment in the Biloxi Hard Rock Casino. Not only was the establishment of the Co-Investment Fund improper, Orecchio, as a consequence of Oliver's breach of his duty of care, was able to calculate the cost basis and allocate the expenses of the project to benefit the investors of the Co-Investment Fund to the detriment of the Fund I investors. Millions of dollars in profit were improperly shifted from Fund I to the Co-Investment Fund, and over $3 million was improperly paid out to the investors of the Co-Investment Fund, including to Orecchio and Oliver, rather than to the Fund I Limited Partners.

105.    As a consequence of Oliver's breach of his duty of care, Orecchio re-invested the proceeds from the sale of the Biloxi Hard Rock Casino, to which the Carpenters' Fund and the Operators' Fund were entitled into the Brush Monroe Fund and then into Xyience, a risky and uncertain venture operated by a twice-convicted felon. Such investment was improper and imprudent, and has resulted in the loss, to date, to the Brush Monroe Fund investors of

approximately $22 million.

106.    As a direct and proximate result of the foregoing, AA Capital suffered substantial damages, in an amount not yet fully ascertained.

## COUNT VI
### (BREACH OF FIDUCIARY DUTY:
### BREACH OF THE DUTY OF LOYALTY AGAINST OLIVER)

107.    The Receiver realleges and incorporates by reference paragraphs 1 through 106 above as paragraph 107 of this Complaint.

108.    As a director and officer of AA Capital, Oliver owed AA Capital a duty of loyalty to protect the interests of AA Capital, which interests included ensuring that AA Capital properly met its obligations as a fiduciary under ERISA and as an SEC registered investment advisor.  In particular, Oliver owed AA Capital, and its investor clients, the duty, *inter alia*: (a) to refrain from furthering the private interests of AA Capital's owners and of its directors and officers at the expense of its investor clients; (b) to refrain from taking any action that would jeopardize the assets under AA Capital's management; and (c) to ensure that the assets of AA Capital and the assets under AA Capital's management were protected.  Further, Oliver owed AA Capital, and its investors, the duty to ensure that AA Capital operated in the best interests of its investors, and that the interests of the investors take precedence over the interests of AA Capital's directors, officers and shareholders.

109.    Also, in his capacity as treasurer of AA Capital, Oliver owed AA Capital a fiduciary duty of loyalty to ensure that the assets of AA Capital's clients were protected and were not mismanaged or misappropriated by AA Capital, its directors or its officers.

110.    Oliver breached the fiduciary duty of loyalty he owed to AA Capital in his capacity as a director and officer of AA Capital by, among other things, failing to ensure that (a)

AA Capital was operated in the best interests of its investors; (b) the interests of the investors took precedence over the interests of AA Capital's directors, officers and shareholders; and (c) AA Capital's pension fund clients' assets were protected and were not mismanaged or misappropriated by AA Capital or by Orecchio, a director and officer of AA Capital.

111.    As a consequence of Oliver's breach of his duty of loyalty, Orrechio was able to misappropriate tens of millions of dollars of client assets for his personal benefit, including, but not limited to, the following:

a.    Orecchio misappropriated an amount in excess of $10.12 million of client assets entrusted to AA Capital by fabricating and inflating capital calls to the limited partners of Fund I and Fund II;

b.    Orecchio misappropriated, by directing capital calls on the trust accounts of the Fund I and Fund II limited partners, an additional amount in excess of $10.38 million of client assets entrusted to AA Capital for which there was no legitimate purpose, but which were classified as "tax payments" or were payments to entities such as J&R Ventures, in which Orecchio had an interest; and

c.    Orecchio misappropriated for his personal use and benefit $7.4 million of client assets entrusted by the Fund II limited partners to AA Capital for the Fund II investment in AART.

112.    Additionally, as a result of Oliver's breach of his duty of loyalty, Orrechio was able to misappropriate at least $9.9 million of client assets in the guise of purported expense reimbursements, which monies were used to fund, among other things: (a) personal travel and entertainment for Orecchio, his girlfriend, friends, his wife and other family members; (b) the construction and operation of Orecchio's Detroit area horse farm; and (c) the renovation and operation of a strip club located in Detroit.

113.    As a result of Oliver's breach of his duty of loyalty, Orecchio improperly established the Co-Investment Fund as a means for Orecchio and his friends and business associates to enjoy the anticipated profit from Fund I's investment in the Biloxi Hard Rock

Casino. Not only was the establishment of the Co-Investment Fund improper, Orecchio, as a result of Oliver's breach of his duty of care, was able to calculate the cost basis and allocate the expenses of the project to benefit the investors of the Co-Investment Fund to the detriment of the Fund I investors. Over $9 million in profit was improperly allocated to the Co-Investment Fund, and over $3 million was improperly paid out to the investors of the Co-Investment Fund.

114.    As a direct and proximate result of the foregoing, AA Capital suffered substantial damages, in an amount not yet fully ascertained.

## COUNT VII
### (BREACH OF FIDUCIARY DUTY:
### WASTE OF CORPORATE ASSETS AGAINST OLIVER)

115.    The Receiver realleges and incorporates by reference paragraphs 1 through 114 above as paragraph 115 of this Complaint.

116.    As a director and officer of AA Capital, Oliver owed AA Capital a fiduciary duty to prevent the waste of corporate assets.

117.    Oliver breached his fiduciary duty to prevent the waste of corporate assets, and to shield the corporation from liabilities, by allowing Orecchio to obtain reimbursement for purported business expenses that served no valid corporate purpose, provided no benefit to AA Capital, and that were far in excess of what AA Capital could reasonably expend, as described above.

118.    As a result of the foregoing, AA Capital suffered substantial damages and impairment of its assets.

## COUNT VIII
### (BREACH OF FIDUCIARY DUTY:
### BREACH OF THE DUTY OF CARE AGAINST ORECCHIO)

119.    The Receiver realleges and incorporates by reference paragraphs 1 through 118

above as paragraph 119 of this Complaint.

120.    As a director and officer of AA Capital, Orecchio owed AA Capital a fiduciary duty of care to protect the interests of AA Capital, which interests were to ensure that AA Capital properly met its obligations as a fiduciary under ERISA and as an SEC registered investment advisor and to otherwise safeguard the assets and minimize the liabilities of AA Capital. Orecchio owed AA Capital, and its investors, the duty to be reasonably informed about the financial affairs of AA Capital, of the investments made by AA Capital on behalf of its pension fund clients, to ensure that all such investments were prudent and appropriate, to monitor such investments and the handling of the client trust accounts, and to take an active and direct role in the management of the affairs of AA Capital.

121.    Also, in his capacity as president of AA Capital, Orecchio owed AA Capital a fiduciary duty of care to make certain the client trust accounts were properly managed and used only for authorized and appropriate investment purposes, and to ensure that there was no mismanagement or misappropriation of such funds.

122.    Orecchio breached the fiduciary duty of care he owed to AA Capital and its investors by misappropriating tens of millions of dollars of client assets for his personal benefit, including, but not limited to, the following:

        a.    Orecchio misappropriated an amount in excess of $10.12 million of client assets entrusted to AA Capital by fabricating and inflating capital calls to the limited partners of Fund I and Fund II;

        b.    Orecchio misappropriated, by directing capital calls on the trust accounts of the Fund I and Fund II limited partners, in excess of $10.38 million of client assets entrusted to AA Capital for which there was no legitimate purpose, but which were classified as "tax payments" or were payments to entities such as J&R Ventures, in which Orecchio had an interest; and

        c.    Orecchio misappropriated for his personal use and benefit $7.4 million of client assets entrusted by the Fund II limited partners to AA Capital for the Fund II investment in AART.

123.    Additionally, Orecchio breached his duty of care by misappropriating millions of dollars of client funds entrusted to AA Capital in the guise of purported expense reimbursements, which monies were used to fund, among other things: (a) personal travel and entertainment for himself, his girlfriend, friends, his wife and other family members; (b) the construction and operation of his Detroit area horse farm; and (c) the renovation and operation of a strip club located in Detroit.

124.    In breach of his fiduciary duty of care, Orecchio re-invested the proceeds from the sale of Fund I's investment in Premier Entertainment, to which the Carpenters' Fund and the Operators' Fund were entitled, into the Brush Monroe Fund and then into Xyience, a risky and uncertain venture operated by a twice-convicted felon. Such investment was improper and imprudent, and has resulted in the loss, to date, to the Brush Monroe Fund investors of approximately $22 million.

125.    As a direct and proximate result of the foregoing, AA Capital suffered substantial damages, in an amount not yet fully ascertained.

### COUNT IX
### (BREACH OF FIDUCIARY DUTY:
### BREACH OF THE DUTY OF LOYALTY AGAINST ORECCHIO)

126.    The Receiver realleges and incorporates by reference paragraphs 1 through 125 above as paragraph 126 of this Complaint.

127.    As a director and officer of AA Capital, Orecchio owed AA Capital a fiduciary duty of loyalty to protect the interests of AA Capital, which interests included ensuring that AA Capital properly met its obligations as a fiduciary under ERISA and as an SEC registered investment advisor. Orecchio owed AA Capital and its investors the duty to refrain from furthering his own private interests at their expense and the duty to refrain from taking any action

to jeopardize the assets of AA Capital or those of its investor clients. Further, Orecchio owed AA Capital, and its investors, the duty to ensure that AA Capital operated in the best interests of its investors, and that the interests of the investors took precedence over the interests of AA Capitals' directors, officers and shareholders.

128.    Also, in his capacity as president of AA Capital, Orecchio owed AA Capital a fiduciary duty of loyalty to ensure that AA Capital's pension fund clients' assets were protected and were not mismanaged.

129.    Orecchio breached the fiduciary duty of loyalty he owed to AA Capital in his capacity as a director and officer of AA Capital by misappropriating tens of millions of dollars of client assets for his personal benefit, including, but not limited to, the following:

   a.    Orecchio misappropriated an amount in excess of $10.12 million of client assets entrusted to AA Capital by fabricating and inflating capital calls to the limited partners of Fund I and Fund II;

   b.    Orecchio misappropriated, by directing capital calls on the trust accounts of the Fund I and Fund II limited partners, an amount in excess of $10.38 million of client assets entrusted to AA Capital for which there was no legitimate purpose, but which were classified as "tax payments" or were payments to entities such as J&R Ventures, in which Orecchio had an interest; and

   c.    Orecchio misappropriated for his personal use and benefit $7.4 million of client assets entrusted by the Fund II limited partners to AA Capital for the Fund II investment in AART.

130.    As a direct and proximate result of the foregoing, AA Capital suffered substantial damages, in an amount not yet fully ascertained.

### COUNT X
### (BREACH OF FIDUCIARY DUTY:
### WASTE OF CORPORATE ASSETS AGAINST ORECCHIO)

131.    The Receiver realleges and incorporates by reference paragraphs 1 through 130 above as paragraph 131 of this Complaint.

132.    As a director and officer of AA Capital, Orecchio owed AA Capital a fiduciary duty not to waste corporate assets.

133.    Orecchio breached his fiduciary duty not to waste corporate assets by seeking and obtaining reimbursement for purported business expenses that served no valid corporate purpose, provided no benefit to AA Capital, and that were far in excess of what AA Capital could reasonably expend, as described above.

134.    As a result of the foregoing, AA Capital suffered substantial damages and impairment of its assets.

## COUNT XI
### (UNJUST ENRICHMENT: AGAINST ORECCHIO)

135.    The Receiver realleges and incorporates by reference paragraphs 1 through 134 above as paragraph 135 of this Complaint.

136.    Between 2002 through September 2006, Orecchio, as an officer of AA Capital, was paid salary and bonuses in excess of $2.1 million.

137.    In April 2006, Orecchio received a payout from the Co-Investment Fund in excess of $530,000.

138.    Orecchio continues to have a residual carried interest in Fund I, Fund II and the Brush Monroe Fund as a member of the general partners of those Funds. In the event that there is a payout to the general partners of any of those funds under the waterfall provisions of their respective partnership agreements, Orecchio will share in a portion of such payout and will personally profit therefore.

139.    Because Orecchio has breached his fiduciary duties of loyalty and care to AA Capital and has been or may be enriched thereby, he is not entitled to retain any compensation or other benefit he received, or may in the future receive, from AA Capital or to personally profit in

any way.

140.    Accordingly, Orecchio has been unjustly enriched in an amount in excess of $2.673 million, which represents the salary, bonuses, and profit he received from AA Capital and its investment funds. Orecchio is required to disgorge all such profits and to forfeit his right to receive any future profit or other payment, including, but not limited to, payments as a result of any residual carried interest as a general partner in Fund I, Fund II and the Brush Monroe Fund.

## COUNT XII
### (CONVERSION: AGAINST ORECCHIO)

141.    The Receiver realleges and incorporates paragraphs 1 through 140 above as paragraph 141 of this Complaint.

142.    Through the conduct described above, Orecchio has converted funds (the "Client Funds") entrusted to AA Capital by its clients to his own personal use. The Receiver calculates that Orecchio has diverted $35,131,769 of Client Funds, as described in detail above.

143.    In doing so, Orecchio wrongfully and without authorization assumed and exercised ownership, dominion, and control over the Client Funds, to the exclusion of AA Capital's rights, and those of its clients, to unconditional and immediate possession of the Client Funds.

144.    On information and belief, Orecchio has spent the diverted Client Funds and is no longer in possession of the Client Funds. Thus, any demand on Orecchio to return the diverted Client Funds is futile.

145.    In converting the Client Funds, Orecchio acted with malice and a willful disregard of the rights of AA Capital, and those of its clients, to the Client Funds.

WHEREFORE, the Receiver prays for entry of judgment in his favor and against

Orecchio and Oliver, as officers and directors of AA Capital, jointly and severally, as follows:

A.    Ordering Orecchio and Oliver, jointly and severally, to restore all losses to the ERISA-governed plans managed by AA Capital, together with pre-judgment interest thereon, caused by Orecchio and Oliver's fiduciary misconduct;

B.    Ordering Orecchio to disgorge any funds and/or profits which he has obtained in violation of ERISA, and to restore to the ERISA-governed plans managed by AA Capital the losses resulting from Orrechio's use of Plan assets in prohibited transactions;

C.    Ordering Orecchio and Oliver, jointly and severally, to restore to AA Capital's investment advisory clients all other losses suffered by them as a result of Orecchio's and Oliver's breaches of fiduciary duty;

D.    Ordering Orecchio and Oliver, jointly and severally, to pay to AA Capital the actual damages it has suffered, in an amount to be determined;

E.    Ordering Orecchio and Oliver to disgorge all salary, benefits, and profits paid to them by AA Capital and/or its Funds;

F.    Ordering Oliver and Orecchio to forfeit any right to any residual carried interest in Fund I, Fund II and the Brush Monroe Fund;

G.    Ordering Orecchio to repay the $35,131,769 of Client Funds he converted for his own personal use, plus pre-judgment interest thereon;

H.    Awarding punitive damages against Orecchio, as a result of his wilfull, malicious, wanton or oppressive breach of fiduciary duty, in an amount to be determined;

I.    Awarding attorneys' fees and prejudgment interest against Orecchio and Oliver jointly and severally, as a result of their violations of ERISA; and

J.    Awarding such other relief as this Court may deem necessary and proper.

## JURY DEMAND

The Receiver hereby requests trial by jury on all claims above for which a jury is

permitted by law.

Dated: June 29, 2007

Respectfully submitted,

W. Scott Porterfield, Receiver for AA
Capital Partners, Inc.

By:

Wendi E. Sloane
One of His Attorneys

Wendi E. Sloane (06183926)
William J. Barrett (06206424)
Jessica Perez Simmons (06288507)
Barack Ferrazzano Kirschbaum &
  Nagelberg LLP
200 West Madison Street
Suite 3900
Chicago, IL 60606-3465

Telephone:  (312) 984-3100
Facsimile:  (312) 984-3150

408221

# EXHIBIT C

## PERSONAL GUARANTEE

To:    Limited Partners of Supplement Partners, L.P. (the "Limited Partners")

I, Brian O'Keefe, in my personal capacity, hereby guaranty the payment in full within ten (10) calendar days of when due of any payments owing under to the Limited Partners under Section 7.2.4 Option A (i) and (ii) under the Supplement Partners, L.P. Limited Partnership Agreement upon its termination. This guaranty shall bind all assets including but not limited to Brian O'Keefe's interest in AA Capital Partners, Inc and its affiliates. This guaranty shall be governed by the laws of the State of Illinois.

_____
                        Brian O'Keefe

Date: _____, 2006

## ACKNOWLEDGMENT OF SIGNATURE

STATE OF _____        )
                             : ss.
County of _____         )

    This instrument was acknowledged before me on _____ __, 2006, by Brian O'Keefe.


_____

(signature)

SEAL

_____

(print name)

Notary Public for the State of _____

Residing at _____

My Commission Expires: _____

-2-

## PERSONAL GUARANTEE

To:    Limited Partners of Supplement Partners, L.P. (the "Limited Partners")

I, John Orecchio, in my personal capacity, hereby guaranty the payment in full within ten (10) calendar days of when due of any payments owing to the Limited Partners under Section 7.2.4 Option A (i) and (ii) under the Supplement Partners L.P. Limited Partnership Agreement upon its termination. This guaranty shall bind all assets including but not limited to John Orecchio's interest in AA Capital Partners, Inc and its affiliates, which includes John Orecchio's carried interest in the Equity Fund of AA Capital Partners, Inc. This guaranty shall be governed by the laws of the State of Illinois.

By:    _____
                    John Orecchio

Date: _____, 2006

-1-

## ACKNOWLEDGMENT OF SIGNATURE

STATE OF _____          )

                                       : ss.

County of _____          )

     This instrument was acknowledged before me on _____ __, 2006, by John Orecchio

 

_____
                              (signature)

SEAL

_____
                              (print name)
Notary Public for the State of _____
Residing at _____
My Commission Expires: _____

## GUARANTEE

To:   Limited Partners of Supplement Partners, L.P. (the "Limited Partners")

J & R Ventures, LLC, hereby guarantees the payment in full within ten (10) calendar days of when due of any payments owing to the Limited Partners under Section 7.2.4 Option A (i) and (ii) under the Supplement Partners, L.P. Limited Partnership Agreement upon its termination.  This guaranty shall bind all assets of J & R Ventures, L.L.C., and its affiliates.  This guaranty shall be governed by the laws of the State of Illinois."

J & R Ventures, LLC


By: _____

      Name:   _____

      Title:    _____

Date: _____, 2006

## ACKNOWLEDGMENT OF SIGNATURE

STATE OF _____        )

                                  : ss.

County of _____        )

      This instrument was acknowledged before me on _____ __, 2006, by _____ as Manager of J & R Ventures, LLC.


_____

                           (signature)

SEAL

_____

                         (print name)

Notary Public for the State of _____

Residing at _____

My Commission Expires: _____

## PLEDGE OF FUNDS AGREEMENT

This Pledge of Funds Agreement (this "Agreement") is by and among John Orecchio ("Guarantor"), and AA Capital Partners, Inc. ("AA"), for the benefit of those limited partners ("Limited Partners") of Supplement Partners, LP, a Delaware limited partnership (the "Partnership"), listed on the attached Schedule 1.

## RECITALS

WHEREAS, Guarantor personally guaranteed all payments owing to the Limited Partners under Section 7.2.4 Option A (i) and (ii) of the Limited Partnership Agreement of the Partnership ("LP Agreement"); and

WHEREAS, Guarantor owns a "carried interest" ("Guarantor's Carried Interest") in the Equity Fund of AA (the "Fund"). The value of Guarantor's Carried Interest in the Fund is not less than _____ Dollars ($_____); and

WHEREAS, Guarantor desires to pledge Guarantor's pledged interest, as defined below, as security for his personal guarantee to the Limited Partners; and

WHEREAS, Guarantor and AA acknowledge and confirm that the security interest held by the Limited Partners in the Guarantor's Pledged Interest pursuant to this Agreement constitutes a first secured position in Guarantor's Pledged Interest.

NOW, THEREFORE, in consideration of the mutual covenants stated herein, and for other good and valuable consideration, the receipt and adequacy of which is acknowledged by the parties, Guarantor and AA agree for the benefit of the Limited Partners as follows:

1.      Guarantor hereby pledges Guarantor's Pledged Interest as security for his personal guarantee given pursuant to the LP Agreement. Guarantors' Pledged Interest shall be that portion of Guarantor's Carried Interest, which shall not be less than _____ Dollars ($_____).

2.      Guarantor's Pledged Interest shall remain in the possession and control of AA until Guarantor's personal guarantee is released under the LP Agreement or as otherwise agreed in writing by Terry O'Keefe or her designee.

3.      Upon receipt of written notification from Terry O'Keefe or her designee directing transfer or redemption of the Guarantor's Pledged Interest, AA shall issue payment of the funds relating to the Guarantor's Pledged Interest, or so much thereof as designated in such notification, to the Limited Partners.

1.      PLEDGE OF FUNDS AGREEMENT

4.    Guarantor shall pay any fees and costs, including reasonable attorneys' fees, incurred by the Limited Partners in obtaining payment of the Guarantor's Pledged Interest.

5.    Guarantor and AA will execute all further documents reasonably necessary to further perfect the security interest of the Limited Partners in the Guarantor's Pledged Interest.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed as of the day and year first above written.


_____
John Orecchio


AA CAPITAL PARTNERS, INC.


By _____
   _____


STATE OF _____        )
                             : ss.
County of _____         )

This instrument was acknowledged before me on _____ __, 2006, by John Orecchio.


_____
(signature)

SEAL

_____
(print name)
Notary Public for the State of _____
Residing at _____
My Commission Expires: _____


2.    PLEDGE OF FUNDS AGREEMENT

STATE OF _____    )

                            : ss.

County of _____    )

       This instrument was acknowledged before me on _____ __, 2006, by _____ as _____ of AA Capital Partners, Inc.


                                    _____

                                            (signature)

SEAL

                                    _____

                                          (print name)

                                  Notary Public for the State of _____

                                  Residing at _____

                                  My Commission Expires: _____

3.      <u>PLEDGE OF FUNDS AGREEMENT</u>

# EXHIBIT D

# LIMITED PARTNERSHIP AGREEMENT

## OF

# Supplement Partners, L.P.

(A Delaware Limited Partnership)

Dated as of June 20, 2006

**Supplement Partners, L.P.**

**TABLE OF CONTENTS**

ARTICLE 1 — DEFINITIONS; SECTION REFERENCES ................................................................. 1
    1.1    DEFINITIONS; SECTION REFERENCES. ......................................................................... 1

ARTICLE 2 — ORGANIZATION; POWERS................................................................................ 2
    2.1    FORMATION OF LIMITED PARTNERSHIP. ....................................................................... 2
    2.2    NAME AND ADDRESS; REGISTERED AGENT. .................................................................. 2
    2.3    PURPOSE; POWERS. ....................................................................................................... 2

ARTICLE 3 — PARTNERS...................................................................................................... 2
    3.1    GENERAL. ...................................................................................................................... 2
        3.1.1    Names, Addresses and Subscriptions. ................................................................. 2
    3.2    LIMITED PARTNERS. ...................................................................................................... 3
        3.2.1    Limited Liability. ............................................................................................... 3
        3.2.2    Effect of Death, Dissolution or Bankruptcy. ...................................................... 3
        3.2.3    No Control of Partnership. .................................................................................. 3
        3.2.4    Admission of Additional Limited Partners. ......................................................... 4
    3.3    MANAGEMENT AND CONTROL OF PARTNERSHIP ........................................................... 4
        3.3.1    Management by General Partner. ........................................................................ 4
            3.3.1.1    Powers of the General Partner. ............................................................ 4
            3.3.1.2    Tax Matters Partner ............................................................................. 5
        3.3.2    Classification as Partnership. ............................................................................. 5
        3.3.3    Time Commitments of General Partner. .............................................................. 6
        3.3.4    Permitted Activities of Partners. ......................................................................... 6

ARTICLE 4 — INVESTMENT PURPOSE .................................................................................... 6
    4.1    INVESTMENT PURPOSE. ................................................................................................. 6

ARTICLE 5 — FEES AND EXPENSES ....................................................................................... 7
    5.1    ORGANIZATIONAL EXPENSES. ....................................................................................... 7
    5.2    MANAGEMENT FEE. ...................................................................................................... 7
    5.3    OPERATING EXPENSES. ................................................................................................. 7

ARTICLE 6 — CAPITAL OF THE PARTNERSHIP ...................................................................... 8
    6.1    OBLIGATION TO CONTRIBUTE. ...................................................................................... 8
        6.1.1    Drawdowns. ....................................................................................................... 8
            6.1.1.1    General. ............................................................................................... 8
            6.1.1.2    Drawdowns. ........................................................................................ 8
        6.1.2    Deficiency Drawdowns. ..................................................................................... 8
            6.1.2.1    General. ............................................................................................... 8
            6.1.2.2    Procedure. ........................................................................................... 9
            6.1.2.3    Amount; effect. .................................................................................... 9
        6.1.3    Payment Obligations of General Partner. ............................................................ 9
        6.1.4    No Interest or Withdrawals. ............................................................................. 10
    6.2    CALL NOTICES. ......................................................................................................... 10
        6.2.1    General. ........................................................................................................... 10
        6.2.2    Timing. ........................................................................................................... 10
        6.2.3    Contents. ......................................................................................................... 10
        6.2.4    Rescission; Postponement. ............................................................................... 11
    6.3    AMOUNT OF CONTRIBUTIONS. .................................................................................... 11
        6.3.1    Apportionment among Partners. ....................................................................... 11
        6.3.2    Form. .............................................................................................................. 11

6.3.3  No Partial Payments in Respect of Drawdowns. ............................................ 11
6.4  FAILURE TO MAKE REQUIRED PAYMENT. ............................................................ 12
6.4.1  Delay Penalty. ..................................................................................... 12
6.4.1.1  *General.* ............................................................................. 12
6.4.1.2  *Payment before notice of default given.* ................................. 12
6.4.1.3  *Designation as Defaulting Partner.* ....................................... 12
6.4.2  Default Charge. ................................................................................... 12
6.4.2.1  *Imposition.* ......................................................................... 12
6.4.2.2  *Reallocation.* ...................................................................... 13
6.4.3  Limitation on Distributions to Defaulting Partner. ................................... 14
6.4.4  Effect of Default on Remaining Interest in Partnership. ............................. 14
6.4.4.1  *No automatic reduction in Remaining Commitment.* .................. 14
6.4.4.2  *Discretionary reduction in Remaining Commitment.* .................. 15
6.4.4.3  *Reduction of Contribution and Capital Account to zero.* ............ 15
6.4.5  Other Remedies. .................................................................................. 15

**ARTICLE 7 — DISTRIBUTIONS** .................................................................................. **16**

7.1  AMOUNT, TIMING AND FORM. ............................................................................ 16
7.2  TAX DISTRIBUTIONS; OTHER DISTRIBUTIONS. ..................................................... 16
7.2.1  Tax Distributions — General. ................................................................ 16
7.2.2  Tax Distributions — Limitations. ........................................................... 17
7.2.3  Advances to Pay Estimated Taxes. ......................................................... 17
7.2.4  Other Distributions. ............................................................................. 18
7.3  TAX LIABILITY MATTERS. ................................................................................. 19
7.3.1  General. ............................................................................................. 19
7.3.2  Repayment of Any Amounts Treated as Loans. ........................................ 20
7.3.3  Partnership Obligation. ........................................................................ 20
7.4  CERTAIN DISTRIBUTIONS PROHIBITED. ............................................................... 21
7.5  RETURN BY GENERAL PARTNER OF CERTAIN DISTRIBUTIONS. ............................... 21
7.5.1  General. ............................................................................................. 21
7.5.2  Limitation. ......................................................................................... 21
7.5.3  Timing; Apportionment; Other Rules. ..................................................... 21

**ARTICLE 8 — ACCOUNTS; ALLOCATIONS** .................................................................. **22**

8.1  CAPITAL ACCOUNTS. ........................................................................................ 22
8.1.1  Creation and Maintenance. ................................................................... 22
8.1.2  Compliance with Treasury Regulations. .................................................. 22
8.2  ALLOCATIONS OF NET GAIN OR LOSS. ................................................................ 23
8.2.1  Net Gain. ........................................................................................... 23
8.2.2  Net Loss. ............................................................................................ 23
8.3  OTHER SPECIALLY ALLOCATED ITEMS. .............................................................. 24
8.3.1  Transfer Expenses. .............................................................................. 24
8.3.2  Delayed Payment Interest. .................................................................... 24
8.3.3  GP Expense Items. ............................................................................... 24
8.4  ALLOCATIONS WHEN INTERESTS CHANGE. .......................................................... 24
8.4.1  General. ............................................................................................. 24
8.4.2  Limitations. ........................................................................................ 25
8.5  LIMITATION ON LOSS ALLOCATIONS. .................................................................. 25
8.5.1  General. ............................................................................................. 25
8.5.2  Offset. ............................................................................................... 26
8.6  TIMING OF ALLOCATIONS. ................................................................................. 26
8.6.1  Year-End Allocations. .......................................................................... 26
8.6.2  Adjustment in Timing of Allocations. ..................................................... 26

**ARTICLE 9 — DURATION OF THE PARTNERSHIP** ........................................................ **26**

9.1  TERM OF PARTNERSHIP. .................................................................................... 26

9.2   DISSOLUTION UPON WITHDRAWAL OF GENERAL PARTNER .................................................... 26
9.3   DISSOLUTION BY PARTNERS. ................................................................................................ 27
9.4   EXTENSION OF TERM. ......................................................................................................... 27

**ARTICLE 10 — LIQUIDATION OF ASSETS ON DISSOLUTION** ..................................... 28

10.1   GENERAL. ........................................................................................................................ 28
10.2   LIQUIDATING DISTRIBUTIONS. ............................................................................................ 28
10.3   EXPENSES OF LIQUIDATOR(S). ............................................................................................ 29
10.4   DURATION OF LIQUIDATION. ............................................................................................... 29
10.5   NO LIABILITY FOR RETURN OF CAPITAL. .............................................................................. 29
   10.5.1   General. ................................................................................................................. 29
   10.5.2   No Limited Partner Deficit Restoration Obligation. .............................................. 29

**ARTICLE 11 — LIMITATIONS ON TRANSFERS AND WITHDRAWALS OF PARTNERSHIP INTERESTS** ........................................................................................................... 30

11.1   NO TRANSFER OF GENERAL PARTNER'S INTEREST. ................................................................ 30
11.2   TRANSFERS OF LIMITED PARTNERSHIP INTERESTS. ............................................................... 30
   11.2.1   General. ................................................................................................................. 30
   11.2.2   Consent of General Partner. .................................................................................. 30
   11.2.3   Other Prohibited Legal Consequences. .................................................................. 31
   11.2.4   Opinion of Counsel. ............................................................................................... 31
   11.2.5   Transfer Expenses. ................................................................................................. 31
   11.2.6   Admission of Substituted Limited Partners. ........................................................... 32
   11.2.7   Status of Transferee Not Admitted as Partner. ...................................................... 32
      11.2.7.1   Permitted Transfer. .......................................................................................... 32
      11.2.7.2   Non-permitted Transfer. .................................................................................. 33
   11.2.8   Multiple Ownership; Other Provisions. .................................................................. 33
      11.2.8.1   Multiple ownership. ......................................................................................... 33
      11.2.8.2   Covenants of Limited Partners. ........................................................................ 33
11.3   NO WITHDRAWAL RIGHTS. ................................................................................................ 34
11.4   SECTION 1045 ROLLOVER MATTERS. .................................................................................. 34

**ARTICLE 12 — EXCULPATION AND INDEMNIFICATION** ......................................... 34

12.1   EXCULPATION. .................................................................................................................. 34
   12.1.1   General. ................................................................................................................. 34
   12.1.2   Activities of Others. ............................................................................................... 35
   12.1.3   Liquidators. ........................................................................................................... 35
   12.1.4   Advice of Experts. .................................................................................................. 35
12.2   INDEMNIFICATION. ............................................................................................................ 36
   12.2.1   General. ................................................................................................................. 36
   12.2.2   Effect of Judgment. ................................................................................................ 36
   12.2.3   Effect of Settlement. ............................................................................................... 37
   12.2.4   Advance Payment of Expenses. .............................................................................. 37
   12.2.5   Insurance. .............................................................................................................. 37
   12.2.6   Other Provisions. ................................................................................................... 38
      12.2.6.1   Successors. ....................................................................................................... 38
      12.2.6.2   Rights to indemnification from other sources. .................................................. 38

**ARTICLE 13 — AMENDMENTS, VOTING AND CONSENTS** ....................................... 38

13.1   AMENDMENTS. .................................................................................................................. 38
   13.1.1   Consent of Partners. .............................................................................................. 38
   13.1.2   Limitations. ............................................................................................................ 38
   13.1.3   Notice of Amendments. ........................................................................................... 39
   13.1.4   Corrective Amendments. ........................................................................................ 39
13.2   VOTING AND CONSENTS. ................................................................................................... 39

**ARTICLE 14 — ADMINISTRATIVE PROVISIONS** ...................................................... 40

14.1     KEEPING OF ACCOUNTS AND RECORDS; CERTIFICATE OF LIMITED PARTNERSHIP. ................................. 40
    14.1.1     Accounts and Records. ........................................................................................................ 40
    14.1.2     Certificate of Limited Partnership. .................................................................................... 40
14.2     INSPECTION RIGHTS. ................................................................................................................. 40
    14.2.1     General. ............................................................................................................................. 40
    14.2.2     Limitations ........................................................................................................................ 41
14.3     FINANCIAL REPORTS. ................................................................................................................ 41
    14.3.1     Annual Reports. ................................................................................................................. 41
        14.3.1.1     Annual financial statements. ................................................................................. 41
        14.3.1.2     Tax information. ..................................................................................................... 41
14.4     VALUATION. ............................................................................................................................. 42
    14.4.1     Valuation by General Partner. .......................................................................................... 42
14.5     ANNUAL MEETINGS. ................................................................................................................. 42
14.6     NOTICES. .................................................................................................................................. 42
    14.6.1     Delivery. ............................................................................................................................ 42
    14.6.2     Addresses. ......................................................................................................................... 43
14.7     ACCOUNTING PROVISIONS. ....................................................................................................... 43
    14.7.1     Fiscal Year. ....................................................................................................................... 43
    14.7.2     Accounting Method. .......................................................................................................... 43
    14.7.3     Independent Accountants. .................................................................................................. 43
    14.7.4     Organizational Expenses. .................................................................................................. 43
        14.7.4.1     General. .................................................................................................................. 43
        14.7.4.2     Placement fees. ....................................................................................................... 44
14.8     GENERAL PROVISIONS. .............................................................................................................. 44
    14.8.1     Power of Attorney. ............................................................................................................ 44
        14.8.1.1     General. .................................................................................................................. 44
        14.8.1.2     Limitation. .............................................................................................................. 44
        14.8.1.3     Survival. ................................................................................................................. 45
    14.8.2     Execution of Additional Documents. ................................................................................. 45
    14.8.3     Binding on Successors. ...................................................................................................... 45
    14.8.4     Governing Law. ................................................................................................................. 45
    14.8.5     Waiver of Partition. ........................................................................................................... 45
    14.8.6     Securities Law Matters. ..................................................................................................... 45
    14.8.7     Miscellaneous. ................................................................................................................... 46

**Signature Pages of Limited Partners**

**Appendix I**      **Definitions**

**Appendix II**     **Regulatory and Tax Allocations**

**Schedule A**      **Names, Addresses, Telecopy Numbers and Subscriptions of Partners**

Supplement Partners, L.P.

## LIMITED PARTNERSHIP AGREEMENT

THIS LIMITED PARTNERSHIP AGREEMENT, dated as of June 20, 2006 (this **"Agreement"**), is by and among J&R Ventures, LLC, a limited liability company organized under the laws of the State of Nevada, as the General Partner, and those persons and entities set forth in Schedule A attached hereto, as the same may be amended, modified or supplemented from time to time, who execute a counterpart of this Agreement, as Limited Partners. The General Partner and the Limited Partners are sometimes referred to herein collectively as the "**Partners**."

### RECITALS:

WHEREAS, Supplement Partners, L.P., a Delaware limited partnership (the "Partnership"), was formed on June 20, 2006; and

WHEREAS, the Partners desire to set forth their agreements and understandings with respect to the business and affairs of the Partnership pursuant to the terms hereof.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1 — DEFINITIONS; SECTION REFERENCES

**1.1** **DEFINITIONS; SECTION REFERENCES.**

Capitalized terms used herein and not otherwise defined have the meanings assigned to them in Appendix 1 attached hereto and made a part hereof. All numerical references contained herein shall refer to Sections, subsections, or Articles of this Agreement, as applicable, unless the context dictates otherwise.

## ARTICLE 2 — ORGANIZATION; POWERS

**2.1** **FORMATION OF LIMITED PARTNERSHIP.**

The Partners agree to form and carry on the Partnership subject to the terms of this Agreement in accordance with the Delaware Revised Uniform Limited Partnership Act, as amended from time to time (the "**Delaware Act**").

**2.2** **NAME AND ADDRESS; REGISTERED AGENT.**

The name of the Partnership is "Supplement Partners, L.P." The affairs of the Partnership shall be conducted under the Partnership name, or such other name as the General Partner may from time to time designate upon written notice to the Limited Partners. The principal office of the Partnership shall be located at its address set forth in Schedule A. The initial address of the Partnership's registered office in Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and its initial registered agent at such address for service of process is The Corporation Trust Company. The General Partner may change the locations of the principal office and registered office of the Partnership to such other locations as the General Partner may specify from time to time in a written notice to the other Partners.

**2.3    POWERS.**

Subject to the other terms hereof, and in furtherance of the investment objectives set forth in 4.1, the Partnership may engage in any lawful activity for which limited partnerships may be organized under the laws of the State of Delaware, and shall have all the powers available to it as a limited partnership organized under the laws of the State of Delaware.

## ARTICLE 3 — PARTNERS

**3.1    GENERAL.**

**3.1.1    Names, Addresses and Subscriptions.**

The name, address, telecopy number and Subscription of each Partner are set forth in Schedule A. The General Partner shall cause Schedule A to be revised, without the necessity of obtaining the consent of any other Partner, to reflect any changes in the identity, addresses, telecopy numbers or Subscriptions of the Partners occurring pursuant to the terms of this Agreement and as otherwise provided in 3.2.4. An amended Schedule A shall supersede any prior Schedule A and become a part of this Agreement.

**3.2    LIMITED PARTNERS.**

**3.2.1    Limited Liability.**

The liability of each of the Limited Partners to the Partnership under the Delaware Act shall be limited to (a) any unpaid capital contributions that such Limited Partner agreed to make to the Partnership pursuant to Article 6, to the extent provided in Section 17-502(a) of the Delaware Act; (b) the amount of any distribution that such Limited Partner is required to return to the Partnership pursuant to Sections 17-607(b) or 17-804(c) of the Delaware Act; and (c) the unpaid balance of any other payments that such Limited Partner expressly is required, pursuant to this Agreement, to make to the Partnership.

**3.2.2    Effect of Death, Dissolution or Bankruptcy.**

Upon the death, incompetence, bankruptcy, insolvency, liquidation or dissolution of a Limited Partner, the rights and obligations of that Limited Partner under this Agreement shall be binding upon, and shall inure to the benefit of, that Limited Partner's successor(s), estate or legal representative, and each such Person shall be treated as an assignee of that Limited Partner's interest for purposes of Article 11 until such time as such Person may be admitted as a Partner pursuant to that Article. As provided in 9.3(b), no such event shall cause a dissolution of the Partnership.

**3.2.3    No Control of Partnership.**

No Limited Partner shall have the right or power to: (a) withdraw or reduce its contribution to the capital of the Partnership except as a result of the dissolution of the Partnership (provided that Limited Partners shall have no right to withdraw or reduce their contributions on dissolution of the Partnership to the extent that the Partnership requires funds to pay its creditors) or as otherwise provided herein; (b) cause the dissolution and winding up of the Partnership except as provided in 9.3(a) and (b); or (c) demand or receive property other than cash in return for its capital contribution. No Limited Partner, in that Person's capacity as such, shall take any part in the control or management of the affairs of the Partnership, or undertake any transactions on behalf of the Partnership, or have any power to sign for or otherwise to act for or bind the Partnership. Limited Partners may, to the extent expressly provided in this Agreement, possess or exercise any of the powers, or have or act in any of the capacities, permitted under Section 17-

303(b) of the Delaware Act for limited partners who are deemed thereby not to participate in the control of the affairs of a limited partnership.

### 3.2.4    Admission of Additional Limited Partners.

Persons may be admitted as Limited Partners with the consent of only the General Partner. Each Person who is to be admitted as an additional or substitute Limited Partner pursuant to this Agreement shall accede to this Agreement by executing, together with the General Partner, a counterpart signature page to this Agreement providing for such admission, which shall be deemed for all purposes to constitute an amendment to this Agreement providing for such admission, but such amendment shall not require the further consent or approval of any other Partner. The General Partner shall make any necessary filings with the appropriate governmental authorities and take such actions as are necessary under applicable law to effectuate such admission, if any. The admission of additional or substitute Limited Partners to the Partnership shall be effective upon (i) the execution of such counterpart signature page to this Agreement or such later effective date as is set forth in any written agreement executed by the General Partner and any newly admitted Partner and (ii) the execution of a subscription agreement with the Partnership, in form and substance acceptable to the General Partner.

### 3.3    MANAGEMENT AND CONTROL OF PARTNERSHIP.

### 3.3.1    Management by General Partner.

#### 3.3.1.1    *Powers of the General Partner.*

As among the Partners, the management, policies and control of the Partnership shall be vested exclusively in the General Partner. Except as otherwise explicitly provided herein, the General Partner shall have the power on behalf and in the name of the Partnership to implement any and all of the objectives of the Partnership and to exercise any and all rights and powers the Partnership may possess including, without limitation, the power to: (i) cause the Partnership to make any elections available to the Partnership under applicable tax or other laws, (ii) employ such Persons to perform the duties required of the General Partner, including such attorneys, accountants, consultants, finders and brokers as may be necessary or desirable, (iii) sell, lease, hold, trade, exchange or otherwise dispose of or transfer all or any portion of the property and assets of the Partnership, (iv) execute, in furtherance of any purpose of the Partnership, any contract, document, instrument and agreement in connection with the investment, management, maintenance and operation of the Partnership's assets and any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, or any other instrument or agreement purporting to convey, lease, sell, transfer or encumber any of the property and assets of the Partnership, and amendments, restatements, supplements and modifications thereof, (v) adjust, settle or compromise any claim, obligation, debt, demand, suit or judgment against the Partnership, and (vi) carry out contracts necessary to, in connection with, or incidental to the accomplishment of the purposes of the Partnership, to the fullest extent as may be lawfully carried on or performed by a partnership under the laws of each state in which the Partnership is then formed or qualified. No Person that is not a Partner, in dealing with the General Partner, shall be required to determine the General Partner's authority to make any commitment or engage in any undertaking on behalf of the Partnership, or to determine any fact or circumstance bearing upon the existence of the authority of the General Partner.

#### 3.3.1.2    *Tax Matters Partner.*

The tax matters partner, as defined in Section 6231 of the Code, of the Partnership (the "**Tax Matters Partner**") shall be the General Partner. The General Partner shall receive no additional compensation from the Partnership for its services in that capacity, but all expenses incurred by the Tax Matters Partner

(including professional fees for such accountants, attorneys and agents as the Tax Matters Partner in its discretion determines are necessary to or useful in the performance of its duties in that capacity) shall be borne by the Partnership. The General Partner shall be entitled to exculpation and indemnification with respect to any action it takes or fails to take as Tax Matters Partner with respect to any administrative or judicial proceeding involving "partnership items" (as defined in Section 6231 of the Code) of the Partnership to the extent provided under Article 12.

### 3.3.2    Classification as Partnership.

The General Partner agrees that it (a) will not cause or permit the Partnership to elect (1) to be excluded from the provisions of Subchapter K of the Code, (2) to be treated as a corporation for federal income tax purposes or (3) to be treated as an "electing large partnership" as defined in Section 775 of the Code; (b) will cause the Partnership to make any election reasonably determined to be necessary or appropriate in order to ensure the treatment of the Partnership as a partnership for federal income tax purposes; (c) will cause the Partnership to file any required tax returns in a manner consistent with its treatment as a partnership for federal income tax purposes; and (d) has not taken, and will not take, any action that would be inconsistent with the treatment of the Partnership as a partnership for such purposes.

### 3.3.3    Time Commitments of General Partner.

The General Partner shall devote such time to the affairs and activities of the Partnership as shall enable the General Partner to comply with the provisions of this Agreement. The principals shall devote the time necessary to manage the affairs of the partnership. The Limited Partners acknowledge that the Principals are also involved in other business activities including managing other partnerships of this type. Neither the Partnership nor any Limited Partner shall by virtue of this Agreement have any right, title or interest in or to any other investment or private equity fund involving the General Partner or its Affiliates.

### 3.3.4    Permitted Activities of Partners.

Each Partner agrees that, subject to the other provisions of this Agreement, any other Partner and its respective partners, members, managers, stockholders, officers, directors, employees, agents and Affiliates may invest, participate, or engage in (for their own accounts or for the accounts of others), or may possess an interest in, other entities or financial ventures and investment and professional activities of every kind, nature and description, independently or with others (and may receive fees, commissions, remuneration or reimbursement of expenses in connection with these activities), whether or not such activities may conflict with any interest of the Partnership or any of the Partners. Neither the Partnership nor any Partner shall have any rights, solely by virtue of this Agreement, in or to (a) any activities permitted by this 3.3.4; or (b) any fees, income, profits or goodwill derived from those activities.

## ARTICLE 4 — INVESTMENT PURPOSE

**4.1    INVESTMENT PURPOSE.**

The principal purpose of the Partnership is to seek to generate a favorable return on investment for the Partners through investing in and owning certain securities of Xyience Incorporated, a Nevada corporation, and engaging in such additional acts and activities incidental or ancillary thereto as the General Partner deems necessary or advisable. Such securities may be directly acquired or acquired through the acquisition of an entity already holding Xyience securities.

## ARTICLE 5 — FEES AND EXPENSES

**5.1    ORGANIZATIONAL EXPENSES.**

Upon completion of the Partnership's initial Drawdown (and at applicable times thereafter), the Partnership shall reimburse the General Partner for all Organizational Expenses incurred by it through such date that are attributable to the organization of the Partnership and the sale of interests in the Partnership to the Limited Partners.

**5.2    MANAGEMENT FEE.**

During the term of the Partnership, the Partnership shall pay to the General Partner an annual management fee (the "Management Fee") for the services rendered to and on behalf of the Partnership, including, without limitation, investment management and administrative services. The Management Fee shall be paid in cash on a quarterly basis in advance by a payment on the first day of each fiscal quarter. The Management Fee shall equal one percent (1.00%) per annum of the aggregate capital contributions of the Partners. The Management Fee shall be paid out of current income and disposition proceeds of the Partnership and, to the extent necessary as determined by the General Partner, from drawdowns that will reduce unfunded commitments of the Partners. The Management Fee shall not be considered a distribution of profits or a return of capital to any Person for any purpose under this Agreement, but shall constitute a Partnership expense to be taken into account in the manner contemplated by Article 8. The Management Fee shall commence as of the Initial Closing Date based on total Subscriptions, regardless of when a Limited Partner is actually admitted.

**5.3    OPERATING EXPENSES.**

All expenses of the Partnership shall be paid solely by the Partnership out of its assets. Such expenses include, without limitation, the following: any and all costs, expenses, fees, liabilities and obligations relating to the Partnership's activities, investments and business, including, without limitation: (i) any and all out-of-pocket fees, charges, costs and expenses incurred by the Partnership, the General Partner or any officer of the General Partner relating to the business and affairs of the Partnership, (ii) any and all taxes (of any kind), fees or other governmental charges which may be assessed or levied against the Partnership, (iii) any and all fees, costs and expenses relating to legal, custodial, auditing, financing, filing, consulting, and accounting services provided to or for the Partnership (including, without limitation, expenses associated with the preparation of the Partnership's financial statements, tax returns and forms K-1), and (iv) any and all other recurring or extraordinary out-of-pocket expenses properly chargeable to the activities of the Partnership.

## ARTICLE 6 — CAPITAL OF THE PARTNERSHIP

**6.1    OBLIGATION TO CONTRIBUTE.**

**6.1.1    Drawdowns.**

*6.1.1.1    General.*

Each Partner agrees to make payments of capital contributions to the Partnership, in accordance with and subject to the terms of this Agreement, in an aggregate amount equal to such Partner's Subscription. All payments of capital contributions shall be made at such times and in such amounts as are specified by the General Partner in Call Notices issued pursuant to 6.2, in separate drawdowns ("**Drawdowns**") as provided in this Article 6. Capital will be called by the General Partner from time to time based on the anticipated needs of the Partnership as determined by the General Partner.

*6.1.1.2    Drawdowns.*

The General Partner is authorized to make Drawdowns of capital contributions from time to time in accordance with this Article 6 for any purpose contemplated under this Agreement.

**6.1.2    Deficiency Drawdowns.**

*6.1.2.1    General.*

If any Limited Partner fails to make a capital contribution when due and becomes a Defaulting Partner, the General Partner may, but shall not be obligated to, call for an additional Drawdown, in accordance with this 6.1.2, equal to such defaulted capital contribution, from Partners, other than the Limited Partner so in default, in the amounts determined pursuant to 6.1.2.3. Any Drawdown pursuant to this 6.1.2 is referred to as a "**Deficiency Drawdown.**"

*6.1.2.2    Procedure.*

If the General Partner determines to make a Deficiency Drawdown, it will either:

    (a)    Amend the original or outstanding Call Notice previously sent to each Limited Partner pursuant to 6.2 in order to increase such Limited Partner's required contribution by its proportionate share of the total Deficiency Drawdown, with such amended Call Notice to be given at least five Business Days before the Drawdown Date for such Deficiency Drawdown; or

    (b)    Deliver a new Call Notice in accordance with 6.2 which shall include the additional Deficiency Drawdown.

*6.1.2.3    Amount; effect.*

The amount of any contribution with respect to a Deficiency Drawdown required to be paid by any Partner pursuant to this 6.1.2 shall bear the same relationship to the aggregate contributions to be made by all Partners with respect to such Deficiency Drawdown as such Partner's Subscription bears to the aggregate Subscriptions of all Partners, other than any Defaulting Partner whose default gave rise to such Deficiency Drawdown. Any payment by a Partner pursuant to this 6.1.2 shall be added to such Partner's Contribution, but shall not increase the total Subscription of such Partner.

**6.1.3    Payment Obligations of General Partner.**

(a)    If the General Partner pays any such Organizational Expenses, such payments shall be deemed to constitute contributions made pursuant to this 6.1.3.1 and the Partnership shall be deemed to have made those payments.

(b)    Any items of Partnership expense or loss attributable to the accrual or payment of any such expenses ("**GP Expense Items**") shall be specially allocated to the Capital Account of the General Partner pursuant to 8.3.3 so that, after all such special contributions, payments and special allocations have occurred, the Capital Accounts of the Partners shall have the same relative balances as if no such expenses had been incurred or paid and no such special contributions or allocations had occurred.

(c)    No special contribution made by the General Partner pursuant to this 6.1.3 shall be treated as part of the General Partner's Contribution or reduce the General Partner's Remaining Commitment.

**6.1.4    No Interest or Withdrawals.**

No interest shall accrue on any capital contribution made by a Partner.  No Partner shall have the right to withdraw or to be repaid any of its capital contributions to the Partnership except as specifically provided in this Agreement.

**6.2    CALL NOTICES.**

**6.2.1    General.**

The General Partner shall specify the time of each Drawdown of capital contributions in a written notice (a "**Call Notice**") given to the Limited Partners prior to the date of such Drawdown (the "**Drawdown Date**").

**6.2.2    Timing.**

The General Partner shall give Call Notices to the Limited Partners at least five (5) calendar days prior to each Drawdown Date, unless such time period is waived, orally or in writing, by the Limited Partners.

**6.2.3    Contents.**

Each Call Notice shall set forth the name of the Partnership and:

(a)    The scheduled Drawdown Date and the total amount of capital contributions to be made by all Partners on the Drawdown Date;

(b)    The required capital contribution to be made by the Limited Partner to which the notice is directed;

(c)    The Partnership account to which such capital contribution shall be paid, including wiring and routing information; and

(d)    Such information relating to the proposed use to be made of the funds obtained by the Partnership as the General Partner in its reasonable discretion determines to include in that Call Notice, if any.

**6.2.4    Rescission; Postponement.**

Any Drawdown in respect of which a Call Notice has been delivered may be rescinded or postponed by the General Partner. The General Partner shall give prompt written notice to each Limited Partner of any such rescission or postponement, whereupon any rescheduled Drawdown Date shall constitute the Drawdown Date for all purposes under this Agreement. A notice of postponement shall restate the entire Call Notice and indicate to the Limited Partners any material changes in the information contained in the original Call Notice.

**6.3    AMOUNT OF CONTRIBUTIONS.**

**6.3.1    Apportionment among Partners.**

The General Partner shall calculate the capital contribution to be made by each Partner pursuant to a Drawdown so that such Partner's capital contribution to be made pursuant to that Drawdown bears the same relationship to such Partner's Subscription as the aggregate capital contributions to be made by all Partners pursuant to such Drawdown bears to the aggregate Subscriptions of all Partners.

**6.3.2    Form.**

All capital contributions shall be made to the Partnership by wire or other transfer of federal or other immediately available funds by 11:00 a.m. Chicago time on the relevant Drawdown Date to the account designated by the General Partner for such purpose.

**6.3.3    No Partial Payments in Respect of Drawdowns.**

Each Partner shall be obligated to make payment in full of each Drawdown on the relevant Drawdown Date, and no Partner shall make (nor shall the Partnership be obligated to accept) any partial payments as to any Drawdown.

**6.4    FAILURE TO MAKE REQUIRED PAYMENT.**

**6.4.1    Delay Penalty.**

*6.4.1.1    General.*

Except upon a waiver by the General Partner, which may or may not be given in its sole discretion, upon any failure by a Limited Partner to pay in full when due the capital contribution to be paid by it on a Drawdown Date, interest will accrue and shall be due at the Default Rate on the outstanding unpaid balance of such capital contribution, from and including such Drawdown Date until the earlier of the date of payment of such capital contribution or such time, if any, as such Limited Partner becomes a Defaulting Partner.

*6.4.1.2    Payment before notice of default given.*

If such Limited Partner fails to pay any such amount when due but pays such amount (together with any accrued interest thereon) prior to the time it becomes a Defaulting Partner, the General Partner shall reflect in the records of the Partnership the amount paid by such Partner, with such amount treated as payment first of accrued interest to the extent thereof; *provided, however*, that no such payment of interest shall increase such Partner's Contribution or Subscription or reduce its Remaining Commitment.

*6.4.1.3   Designation as Defaulting Partner.*

A Limited Partner that has failed to make a payment in satisfaction of such Partner's Subscription (together with any interest or other amounts due) pursuant to a Call Notice by the close of business on the date that is three Business Days after the relevant Drawdown Date and has also failed to make such payment on or before the date that is five Business Days after the General Partner has given written notice to such Limited Partner of its failure to make such payment, shall be deemed to be a "**Defaulting Partner**."

**6.4.2   Default Charge.**

*6.4.2.1   Imposition.*

The Partners agree that the damages suffered by the Partnership as the result of any failure by a Partner to make a capital contribution or other payment to the Partnership that is required by this Agreement cannot be estimated with reasonable accuracy. As liquidated damages for such default (which each Partner hereby agrees are reasonable), the Contribution and Capital Account of a Defaulting Partner shall, at the sole discretion of the General Partner, be reduced by an amount equal to 50% of such Defaulting Partner's Subscription at the time of the default (the "**Default Charge**").

*6.4.2.2   Reallocation.*

(a)   The amount of any Default Charge levied upon a Defaulting Partner shall immediately become unrestricted funds of the Partnership and shall be allocated:

(i)   As to the Contribution amount, to and among the respective Contributions of the non-defaulting Partners in proportion to their respective Contributions; provided, to the extent applicable, any amount deducted from a Defaulting Partner's Capital Account shall be allocated to the non-Defaulting Partners pro rata in accordance with their respective capital commitments; and

(ii)   As to the Capital Account amount, to and among the respective Capital Accounts of the non-defaulting Partners in proportion to the positive balances in their respective Capital Accounts.

(b)   For purposes of 6.4.2.2(a):

(i)   The amount by which a Defaulting Partner's Contribution or Capital Account is reduced shall in no case exceed the Defaulting Partner's Contribution or the positive balance in such Defaulting Partner's Capital Account, respectively, immediately before the reduction;

(ii)   If either the Contribution or the Capital Account of the Defaulting Partner otherwise would be reduced below zero by the imposition of the full amount of any Default Charge, that Contribution or the balance in that Capital Account shall be reduced to zero and any excess of the full amount of the Default Charge over the amount of the Defaulting Partner's Contribution or the positive balance in its Capital Account immediately before such reduction, as appropriate, shall be carried over and applied to reduce such Defaulting Partner's Contribution or the balance in its Capital Account, as appropriate, at such subsequent time or times

as that Contribution is greater than zero or that Capital Account has a positive balance;

(iii)   Any increase in the Contributions or Capital Accounts of non-defaulting Partners as the result of the imposition of a Default Charge shall occur only at such time or times as the corresponding reduction in the Defaulting Partner's Contribution or Capital Account occurs; and

(iv)   If any valuation or revaluation of the Fund or its assets is required, the provisions of 14.4.1 shall control.

**6.4.3    Limitation on Distributions to Defaulting Partner.**

The General Partner, in its sole discretion, may cause the Partnership to withhold any distributions that otherwise would be made to a Defaulting Partner; *provided, however,* that if, on or before the date that is ten (10) calendar days after notice of a default was given to such Partner, such Partner has paid to the Partnership all amounts then due and payable, any distributions so withheld shall be delivered to such Partner at the end of that ten-day period.  If any Defaulting Partner does not make full payment to the Partnership of all amounts due and payable on or before the date that is ten (10) calendar days after notice of a default was given to such Partner, then, notwithstanding any other provision of this Agreement, the General Partner in its sole discretion may cause the Partnership to retain, and use for any purpose, any amounts otherwise distributable to such Defaulting Partner until such time as the Partnership makes its final liquidating distribution.

**6.4.4    Effect of Default on Remaining Interest in Partnership.**

*6.4.4.1    No automatic reduction in Remaining Commitment.*

The application of the aforesaid liquidated damages provisions shall not relieve any Defaulting Partner of such Partner's obligation to make all payments of its capital contributions pursuant to Drawdowns when due.

*6.4.4.2    Discretionary reduction in Remaining Commitment.*

The General Partner, in its sole discretion, may determine that no additional capital contribution shall be accepted from the Defaulting Partner, in which case the General Partner shall so notify such Defaulting Partner in writing.  As of the date that such notice is sent to the Defaulting Partner, such Defaulting Partner's Remaining Commitment shall be reduced to zero and such Defaulting Partner's Subscription shall be reduced to an amount equal to such Defaulting Partner's Contributions as of such date.

*6.4.4.3    Reduction of Contribution and Capital Account to zero.*

If each of the Defaulting Partner's Contribution and the balance in its Capital Account have been reduced to zero and either (a) the Remaining Commitment of each Partner (other than any Defaulting Partner) has been reduced to zero, or (b) the General Partner has determined that such Defaulting Partner shall not be permitted to make any further capital contributions to the Partnership, such Defaulting Partner's interest in the Partnership shall be extinguished completely and the Partnership shall have no further obligation of any nature to such Person.

**6.4.5    Other Remedies.**

In addition to the Defaulting Partner's obligation to pay to the Partnership any interest owed by such Defaulting Partner as provided in 6.1.1.1, all costs of collection (including reasonable attorneys' fees), and interest at the Default Rate on all such costs from the date paid, and the Default Charge remedy set forth in 6.4.2, and the ability of the General Partner to deny the Defaulting Partner the right to participate in votes or consents of the Partners, the Partnership shall have any and all other remedies available under law or in equity to a limited partnership organized under the Delaware Act to enforce the collection from the Defaulting Partner of any unpaid capital contributions for which a Drawdown Notice has been issued. All such other remedies shall be cumulative.

The Partners specifically intend and agree that the enforceability of this Agreement (including Section 6.4) shall benefit from Section 17-502(c) of the Delaware Act, which states, in part: "A partnership agreement may provide that the interest of any partner who fails to make any contribution that he is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure," and Sections 17-1101(b) and (c) of the Delaware Act which state: "(b) The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this chapter" and "(c) It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."

## ARTICLE 7 — DISTRIBUTIONS

**7.1    AMOUNT, TIMING AND FORM.**

Except as otherwise expressly provided in this Agreement, the General Partner shall determine the calculation, amount and timing of all distributions made by the Partnership. Except as authorized by the General Partner and approved by a Majority in Interest of the Limited Partners, all distributions made before the commencement of the liquidation of the Partnership's assets pursuant to Article 10 (and, to the extent practical, thereafter) shall consist of cash. After provision for sufficient working capital consistent with good fiscal operating policy and management and such other needs as the General Partner, in its reasonable discretion, shall deem necessary, the General Partner anticipates causing Distributable Proceeds to be distributed hereunder no later than 120 days following the receipt thereof. No distribution hereunder shall be made: (a) if such distribution would violate any contract or agreement to which the Partnership is then a party or any law, rule, regulation, order or directive of any governmental agency, department or authority then applicable to the Partnership; (b) to the extent that the General Partner, in its sole discretion, determines that any amount otherwise distributable should be retained by the Partnership to pay, or to establish a reserve for the payment of, any liability or obligation of the Partnership, whether liquidated, fixed, contingent or otherwise; or (c) to the extent that the General Partner, in its sole discretion, determines that the cash available to the Partnership is insufficient to permit such distribution.

**7.2    TAX DISTRIBUTIONS; OTHER DISTRIBUTIONS.**

**7.2.1    Tax Distributions — General.**

Subject to 7.2.2, if net income of the Partnership is allocated to the Partners in any fiscal year, the Partnership may distribute to each Partner in cash, with respect to each fiscal year, either during such year or within 90 days thereafter, an amount (a "**Tax Distribution**") equal to the aggregate federal, state and local income tax liability such Partner would have actually incurred as a result of such Partner's ownership of an interest in the Partnership, determined: (a) as if such Partner were a natural person resident in the Designated Jurisdiction; (b) as if such Partner were subject to tax on all taxable income and gains allocated to such Partner by the Partnership with respect to such fiscal year (net of all items of

deductible loss or expenses so allocated but excluding expenses otherwise deductible by a natural person only under Section 212 of the Code) at the highest marginal rates provided for under applicable federal and Designated Jurisdiction income tax laws (taking into account, in determining federal taxable income, any allowable deduction for Designated Jurisdiction taxes), as determined from time to time by the General Partner and calculated with respect to the character of items of income, gain, loss, deduction and credit at the Partnership level; and (c) without regard to the carryover of items of loss, deduction and expense previously allocated by the Partnership to such Partner.

### 7.2.2   Tax Distributions — Limitations.

The aggregate amount of any Tax Distributions may be reduced or not made with respect to any fiscal year if and to the extent determined by the General Partner in its sole discretion after consultation with the Partnership's accountants.

### 7.2.3   Advances to Pay Estimated Taxes.

The Partnership may, but shall not be obligated to, make Tax Distributions to all Partners during any Partnership fiscal year to enable them to satisfy their liability to make estimated tax payments with respect to such fiscal year or the preceding fiscal year based on calculations of the Partners' estimated tax liability made pursuant to 7.2.1 as of such dates as the General Partner in its discretion may determine, subject to the following:

(a)     If the aggregate amount of Tax Distributions made to the General Partner with respect to any fiscal year exceeds the tax liability of the General Partner with respect to such fiscal year (calculated as of the end of such fiscal year pursuant to 7.2.1), the General Partner shall treat such excess as an advance and return such excess to the Partnership without interest within twenty (20) Business Days after the Partnership's accountants have determined that such excess Tax Distribution has been made; and

(b)     The Capital Account of the General Partner shall be increased by any amount returned by the General Partner to the Partnership pursuant to 7.2.3(a), but the Contribution of the General Partner shall not be affected by any such return.

### 7.2.4   Other Distributions.

Except as otherwise provided in this Agreement, Distributable Proceeds shall be distributed to the Partners as follows:

Option A

(i)     First, until each Limited Partner has received an amount equal to its respective Contribution, 100% to each such Limited Partner in proportion to such Limited Partner's respective Contribution;

(ii)    Second, until each Limited Partner has received an amount equal to 15% per annum accrued interest based on its Contribution amount

(iii)   Third, 35% of the remaining proceeds after (i) and (ii) have been paid in full and 65% to the General Partner

(iv)    The payments in (i) and (ii) will be guaranteed by the General Partner and additionally personally guaranteed by the principals of the General Partner

Option B

(v)    First, until each Limited Partner has received an amount equal to its respective Contribution, 100% to each such Limited Partner in proportion to such Limited Partner's respective Contribution

(vi)    Second, until each Limited Partner has received an amount that equals an 8% cumulative return for the current fiscal year and all prior fiscal years on the amount of unreturned Contributions (from the date of such Contribution until the date of repayment of such portion of the Contribution) to such Limited Partner pursuant to 7.2.4(vi) ("**Preferred Return**"), 100% to each such Limited Partner in proportion to such Limited Partner's Contribution;

(vii)    Third, 80% of remaining proceeds to each Limited Partner and 20% to the General Partner

## 7.3    TAX LIABILITY MATTERS.

### 7.3.1    General.

If the Partnership incurs any obligation to pay directly any amount in respect of taxes, including, but not limited to, withholding taxes imposed on any Partner's or former Partner's share of the Partnership gross or net income and gains (or items thereof), income taxes, and any interest, penalties or additions to tax ("**Tax Liability**"), or the amount of cash or other property to which the Partnership otherwise would be entitled is reduced as a result of withholding by other parties in satisfaction of any such Tax Liability:

(a)    All payments by the Partnership in satisfaction of that Tax Liability and all reductions in the amount of cash to which (but for such Tax Liability) the Partnership would have been entitled shall be treated, pursuant to this 7.3, as distributed to those Partners or former Partners to which the related Tax Liability is attributable;

(b)    Notwithstanding any other provision of this Agreement, subsequent distributions to the Partners shall be adjusted by the General Partner in an equitable manner so that, after all such adjustments have been made and to the extent feasible, the burden of taxes withheld at the source or paid by the Partnership is borne by those Partners to which such tax obligations are attributable (determined pursuant to 7.3.3); and

(c)    The General Partner in its sole discretion may cause any amount treated pursuant to 7.3.1(a) as distributed to any Partner or former Partner at any time that exceeds the amount (if any) of distributions to which such Person is then entitled under any provision of this Agreement to be treated for all purposes of this Agreement as if that excess amount had been loaned to such Person, in which event the General Partner shall cause the Partnership to give prompt written notice to such Person of the date and amount of such loan.

**7.3.2    Repayment of Any Amounts Treated as Loans.**

Each Partner covenants, for itself, its successors, assigns, heirs and personal representatives, that such Person shall pay any amount due to the Partnership at any time after notice of any loan described in 7.3.1(c) has been given, but not later than thirty (30) days after the Partnership delivers a written demand to such Person for such repayment (which demand may be made at any time prior to or after the dissolution of the Partnership or the General Partner or the withdrawal of such Person or its predecessors from the Partnership); *provided, however,* that if any such repayment is not made within such 30-day period:

(a)    Such Person shall pay interest to the Partnership at the Prime Rate for the entire period commencing on the date on which the Partnership paid such amount and ending on the date on which such Person repays such amount to the Partnership together with all accrued but previously unpaid interest; and

(b)    The Partnership, at the discretion of the General Partner, shall (1) collect such unpaid amounts (including interest) from any distributions that otherwise would be made by the Partnership to such Person and/or (2) subtract from the Capital Account of such Person, no later than the day prior to the Partnership's initial liquidating distribution, the amount of any such tax withholding (plus unpaid interest) not so collected, in each case treating the amount so collected or subtracted as having been distributed to such Person at the time of such collection or subtraction.

**7.3.3    Partnership Obligation.**

For purposes of this 7.3, any obligation to pay any amount in respect of any Tax Liability (including any interest, penalties or additions to tax) incurred by the General Partner with respect to income of or distributions made to any other Partner or former Partner shall constitute a Partnership obligation.

**7.4    CERTAIN DISTRIBUTIONS PROHIBITED.**

Anything in this Article 7 to the contrary notwithstanding:

(a)    No distribution shall be made to any Partner if, and to the extent that, such distribution would not be permitted under Sections 17-607(a) or 17-804(a) of the Delaware Act; and

(b)    No distribution other than a Tax Distribution shall be made to any Partner to the extent that such distribution, if made, would cause the deficit balance, if any, in the Capital Account of such Partner (determined without regard to any allocations made pursuant to Appendix II) to exceed such Partner's Restoration Amount or would further reduce an existing balance (as so determined) that is already negative in an amount exceeding such Partner's Restoration Amount.

**7.5    RETURN BY GENERAL PARTNER OF CERTAIN DISTRIBUTIONS.**

**7.5.1    General.**

If, following the dissolution, winding up and termination of the Partnership and the distribution of all or substantially all of the Partnership's assets, the General Partner has received an aggregate amount in excess of that otherwise properly distributable to the General Partner pursuant to 7.2.4, the General Partner shall promptly contribute to the Partnership an amount equal to any such excess.

**7.5.2    Limitation.**

The aggregate amount which must be repaid by the General Partner to the Partnership pursuant to 7.5.1 shall be net the amount of any Tax Distributions received by the General Partner. The Partners intend that, after the Partnership's final liquidating distribution and before the returns otherwise required of the General Partner pursuant to 7.5, the General Partner shall have a negative Capital Account balance equal to the amount (if any) that it is required pursuant to 7.5 to return, and this Agreement shall be interpreted and applied accordingly.

**7.5.3    Timing; Apportionment; Other Rules.**

(a)    On or before the 90th day after the Partnership makes its final liquidating distribution, the General Partner shall return to the Partnership, in cash, the full amount that, pursuant to 7.5.1 (as limited by 7.5.2), the General Partner is required to return.

(b)    Any amount returned by the General Partner shall be distributed to the Limited Partners in proportion to their respective Contributions.

**ARTICLE 8 — ACCOUNTS; ALLOCATIONS**

**8.1    CAPITAL ACCOUNTS.**

**8.1.1    Creation and Maintenance.**

There shall be established on the books of the Partnership a capital account for each Partner (such Partner's "**Capital Account**") that shall be:

(a)    *Increased* by (1) any capital contributions made to the Partnership by such Partner pursuant to this Agreement, (2) any part of a Default Charge added to the Capital Account of such Partner pursuant to 6.4.2, and (3) any amounts in the nature of income or gain added to the Capital Account of such Partner pursuant to 8.2, 8.3, 8.4, 8.5 or Appendix II; and

(b)    *Decreased* by (1) any distributions made to such Partner, (2) any Default Charge subtracted from the Capital Account of such Partner pursuant to 6.4.2; and (3) any amounts in the nature of loss or expense subtracted from the Capital Account of such Partner pursuant to 8.2, 8.3, 8.4, 8.5 or Appendix II.

**8.1.2    Compliance with Treasury Regulations.**

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704(b) of the Code and Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event that the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Articles 7 or 10 or the timing of such distributions.

8.2    ALLOCATIONS OF NET GAIN OR LOSS.

8.2.1    **Net Gain.**

(a)    As of the end of each fiscal year of the Partnership and after giving effect to the special allocations set forth in 8.3, 8.4, 8.5 and Appendix II, the Net Gain attributable to the Partnership for such fiscal year shall be allocated to the Partners as follows:

(i)    First, until Net Gain allocated pursuant to this 8.2.1(a)(i) for the current fiscal year and all prior fiscal years is equal to 2.5 times the Contributions of the Limited Partners, 20% to the General Partner, and 80% to the Limited Partners in proportion to their respective Contributions;

(ii)    Second, until Net Gain allocated pursuant to this 8.2.1(a)(ii) for the current fiscal year and all prior fiscal years is equal to 5.0 times the Contributions of the Limited Partners, 30% to the General Partner, and 70% to the Limited Partners in proportion to their respective Contributions; and

(iii)    Thereafter, 50% to the General Partner, and 50% to the Limited Partners in proportion to their respective Contributions.

8.2.2    **Net Loss.**

(a)    Net Loss attributable to Portfolio Investments.  As of the end of each fiscal year of the Partnership and after giving effect to the special allocations set forth in 8.3, 8.4, 8.5 and Appendix II, Net Loss attributable to the Partnership for such fiscal year shall be allocated to the Partners in proportion to their respective Contributions.

(b)    Other Net Losses.  Losses not described in 8.2.2(a) shall be allocated to the Partners in proportion to their Contributions.

8.3    OTHER SPECIALLY ALLOCATED ITEMS.

As of the end of each fiscal year of the Partnership and after giving effect to the special allocations set forth in Appendix II, the following items shall be specially allocated in the manner set forth below.

8.3.1    **Transfer Expenses.**

The unpaid Transfer Expenses (if any) of the Partnership for such fiscal year shall be allocated to the transferor or the transferee of the Partnership interest involved to the extent required by 11.2.5.

8.3.2    **Delayed Payment Interest.**

The Delayed Payment Interest (if any) of the Partnership for such fiscal year shall be allocated to all Partners other than the Partner liable to pay such interest in proportion to their respective Contributions.

8.3.3    **GP Expense Items.**

The GP Expense Items (if any) of the Partnership for such fiscal year shall be allocated to the General Partner.

**8.4**    **ALLOCATIONS WHEN INTERESTS CHANGE.**

**8.4.1    General.**

If any Person is admitted to the Partnership (or the Subscription of any existing Partner is increased) after the Initial Closing Date, the General Partner shall adjust subsequent allocations of items of Partnership income, gain, loss and expense otherwise provided for in this Article 8 and Appendix II as necessary so that, after such adjustments have been made each Partner (including, but not limited to, any Partners admitted after the Initial Closing Date and all Partners whose Subscriptions have been increased after the Initial Closing Date) shall have been allocated an aggregate amount of such items equal in amount to the aggregate amount of such items such Partner would have been allocated if it had been admitted to the Partnership on the Initial Closing Date with a Subscription equal to that set forth in Schedule A after such schedule has been revised to reflect such Partner's admission or the increase in its Subscription.

**8.4.2    Limitations.**

The allocations otherwise required by 8.4.1 shall be limited to the extent necessary to ensure that:

(a)    No item of income, gain or deductible loss realized before the admission of any new Partner shall be allocated to such Partner pursuant to 8.4.1; and

(b)    Allocations to any existing Partner of income, gain or deductible loss realized prior to the increase in the Subscription of such Partner shall be limited to those permitted by Section 706 of the Code.

**8.5**    **LIMITATION ON LOSS ALLOCATIONS.**

**8.5.1    General.**

(a)    If and to the extent that any allocation of Partnership items in the nature of loss or expense to any Partner would cause such Partner's Capital Account to be negative in an amount which exceeds such Partner's Restoration Amount or would further reduce an existing balance that is already negative in an amount that exceeds such Partner's Restoration Amount, then such item(s) shall be allocated first to the Capital Accounts of the other Partners in proportion to the positive balances in their respective Capital Accounts until all such Capital Accounts are reduced to zero, then to the Capital Accounts of Partners with Restoration Amounts, in proportion to their respective Restoration Amounts, until each such Partner's Capital Account is negative in an amount equal to such Partner's Restoration Amount, and then to the Capital Account of the General Partner.

(b)    An allocation pursuant to 8.5.1(a) shall be made only if and to the extent that the deficit in such Partner's Capital Account would exceed such Partner's Restoration Amount after all allocations required by this Article 8 have been made tentatively as if 8.5 and Appendix II were not included in this Agreement.

**8.5.2    Offset.**

If any special allocations of losses or expenses are made pursuant to 8.5.1, items of gross Partnership income and gain from subsequent periods shall be specially allocated to offset, to the extent feasible and as promptly as possible, such special allocations of loss or expense.

**8.6      TIMING OF ALLOCATIONS.**

**8.6.1      Year-End Allocations.**

The General Partner shall cause the allocations required by this Agreement to be made no less frequently than as of the end of each fiscal year.

**8.6.2      Adjustment in Timing of Allocations.**

The General Partner, in its discretion, may cause the Partnership to make the allocations described in Article 8 (other than allocations for tax purposes pursuant to Part 4 of Appendix II) at a time other than as of the end of a fiscal year on the basis of an interim closing of the Partnership's books at such time. In that event, each short fiscal period attributable to any such interim closing shall constitute a fiscal year for purposes of this Article 8.

## ARTICLE 9 — DURATION OF THE PARTNERSHIP

**9.1      TERM OF PARTNERSHIP.**

The term of the Partnership shall commence upon the date of the filing of the Certificate of Limited Partnership of the Partnership with the office of the Secretary of State of the State of Delaware and shall continue until the third (3rd) anniversary of the Initial Closing Date, unless its term is extended as provided in 9.4, or unless it is sooner dissolved as provided in 9.2 or 9.3 or by operation of law.

**9.2      DISSOLUTION UPON WITHDRAWAL OF GENERAL PARTNER.**

   (a)      The Partnership shall be dissolved if there shall occur with respect to the General Partner any of the events of withdrawal described in Sections 17-402(a)(2) through 17-402(a)(5) of the Delaware Act, or if the General Partner reasonably determines (after consultation with counsel) that termination of the Partnership is required in order for the Partnership to comply with a material statute, law, rule, order, decree, regulation, writ, or injunction to which the Partnership is subject.  The death, withdrawal, temporary or permanent incapacity, insanity, incompetency, bankruptcy, expulsion or removal of any member, manager or officer of the General Partner shall not dissolve the Partnership.  The reorganization, merger, sale of all or substantially all of the securities or assets of, or other change in the ownership or nature of the General Partner shall not dissolve the Partnership.

   (b)      If the General Partner suffers an event that, with the passage of the period specified in the Delaware Act, becomes an event of withdrawal under Section 17-402(a)(4) or (5) of the Delaware Act, the General Partner shall notify each Limited Partner of the occurrence of such event within 30 days after the occurrence of such event (or within the maximum time then permitted under the Delaware Act).

**9.3      DISSOLUTION BY PARTNERS.**

   (a)      Upon the written consent of the General Partner, together with the written consent of at least 66-2/3% in interest of the Limited Partners, may dissolve the Partnership at any time on not less than 90 days' prior written notice of such dissolution to the other Partners.

(b)     The Partnership shall not be dissolved in the event of the death, bankruptcy, liquidation, dissolution, insolvency, incompetence, incapacity, disability, substitution or admission of any Limited Partner, or any other similar event involving the existence, status or organization of a Limited Partner.

## 9.4     EXTENSION OF TERM.

(a)     It is contemplated by the Partners that the Partnership shall dissolve and commence its winding up on the third (3rd) anniversary of the Initial Closing Date, without any further action being required by any of the Partners, unless sooner dissolved pursuant to 9.2 or 9.3 or by operation of law.

(b)     Notwithstanding the foregoing, the term of the Partnership may be extended for up to two (2) additional one-year periods at the discretion of the General Partner. The General Partner shall notify the Limited Partners promptly of any such extension. Any such extension shall be subject to the rights of the Partners to dissolve the Partnership as provided in 9.3.

## ARTICLE 10 — LIQUIDATION OF ASSETS ON DISSOLUTION

### 10.1     GENERAL.

Following dissolution, the Partnership's assets shall be liquidated in an orderly manner. The General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement; *provided, however,* that if there shall be no remaining General Partner at that time, a Majority in Interest of the Limited Partners may designate one or more other Persons to act as the liquidator(s) of the Partnership instead of the General Partner. Any such liquidator, other than the General Partner, shall be a "liquidating trustee" within the meaning of Section 17-101(9) of the Delaware Act.

### 10.2     LIQUIDATING DISTRIBUTIONS.

(a)     The liquidator(s) shall pay or provide for the satisfaction of the Partnership's liabilities and obligations to creditors. In performing their duties, the liquidator(s) are authorized to sell, exchange or otherwise dispose of the assets of the Partnership in such reasonable manner as the liquidator(s) shall determine to be in the best interest of the Partners.

(b)     Any Net Gain or Loss or other items realized in connection with the liquidation of the Partnership's assets shall be allocated among the Partners pursuant to Article 8, and the remaining assets of the Partnership shall then be distributed to the Partners in cash in proportion to the positive balances in their respective Capital Accounts.

(c)     During the liquidation of the Partnership, the liquidator(s) shall furnish to the Partners the financial statements and other information specified in 14.3.

### 10.3     EXPENSES OF LIQUIDATOR(S).

The expenses incurred by the liquidator(s) in connection with winding up the Partnership, all other losses or liabilities of the Partnership incurred in accordance with the terms of this Agreement, and reasonable compensation for the services of the liquidator(s) shall be borne by the Partnership.

**10.4    DURATION OF LIQUIDATION.**

    (a)    A reasonable time shall be allowed for the winding up of the affairs of the Partnership in order to minimize any losses otherwise attendant upon such a winding up.

    (b)    The liquidator(s) shall use reasonable efforts to carry out the liquidation in conformity with the timing requirements of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), but will not be bound to do so or liable in any way to any Partner for failure to do so.

**10.5    NO LIABILITY FOR RETURN OF CAPITAL.**

**10.5.1    General.**

The liquidator(s), the General Partner and their respective partners, members, stockholders, officers, directors, managers, employees, agents and Affiliates shall not be personally liable for the return of the capital contributions of any Partner to the Partnership except as expressly written in this document.

**10.5.2    No Limited Partner Deficit Restoration Obligation.**

No Limited Partner shall be obligated to restore to the Partnership any amount with respect to a negative Capital Account; *provided, however,* that this provision in no way shall affect the obligations of Partners to make their agreed-upon capital contributions and other payments to the Partnership.

**ARTICLE 11 — LIMITATIONS ON TRANSFERS AND
WITHDRAWALS OF PARTNERSHIP INTERESTS**

**11.1    NO TRANSFER OF GENERAL PARTNER'S INTEREST.**

The General Partner shall not assign, pledge, mortgage, hypothecate, give, sell or otherwise dispose of or encumber (collectively, "**Transfer**") all or any part of its general partnership interest. Any attempted Transfer of the General Partner's interest shall be void.

**11.2    TRANSFERS OF LIMITED PARTNERSHIP INTERESTS.**

**11.2.1    General.**

    (a)    No Transfer of a Limited Partner's interest in the Partnership, in whole or in part, shall be made other than pursuant to this 11.2. Any attempted Transfer of all or any part of the interest in the Partnership of a Limited Partner without compliance with this Agreement shall be void.

    (b)    Every Transfer shall be subject to all of the terms, conditions, restrictions and obligations set forth in this Agreement.

    (c)    Each Transfer shall be evidenced by a written agreement, in form and substance satisfactory to the General Partner, that is executed by the transferor, the transferee(s) and the General Partner.

**11.2.2    Consent of General Partner.**

The prior written consent of the General Partner, which may be granted or withheld in its absolute discretion, shall be required for any Transfer of part or all of any Limited Partner's interest in the

Partnership; provided, however, the General Partner shall not unreasonably withhold such consent with respect to a transfer by a Limited Partner to an Affiliate of such Limited Partner if such Transfer otherwise complies with the requirements of this 11.2. Prior to approving any proposed Transfer, the General Partner shall consult with the Partnership's tax advisors to determine whether such Transfer, if consummated, would cause the Partnership to undergo a technical termination for United States federal income tax purposes and, if so, whether such termination would be likely to cause material adverse United States federal income tax consequences, or the incurrence of material additional expense, by the Partnership or the Partners.

**11.2.3  Other Prohibited Legal Consequences.**

No Transfer shall be permitted, and the General Partner shall withhold its consent with respect thereto, if such Transfer would:

(a)    Result in violation of the registration requirements of the Securities Act;

(b)    Require the Partnership to register as an investment company under the United States Investment Company Act of 1940, as amended;

(c)    Require the General Partner to register as an investment adviser under the United States Investment Advisers Act of 1940, as amended;

(d)    Result in the Partnership being classified for United States federal income tax purposes as an association taxable as a corporation; or

(e)    Result in the Partnership being subject to United States federal income tax at the entity level under Section 7704 of the Code.

**11.2.4  Opinion of Counsel.**

Any Transfer otherwise permitted hereunder shall be made only upon receipt by the Partnership of a written opinion of counsel for the Partnership, or of other counsel reasonably satisfactory to the Partnership, in form and substance satisfactory to the General Partner (which opinion shall be obtained at the expense of the transferor), as to compliance with 11.2.3 hereof and such other legal matters as the General Partner may reasonably request. The General Partner may, in its sole discretion, waive the requirement to deliver an opinion pursuant to this 11.2.4. Failure to request such opinion from any one transferor shall not preclude the General Partner from making such request of any other transferor.

**11.2.5  Transfer Expenses.**

The transferor of any interest in the Partnership hereby agrees to reimburse the Partnership, at the request of the General Partner, for any expenses reasonably incurred by the Partnership in connection with such Transfer, including any legal, accounting and other expenses ("**Transfer Expenses**"), whether or not such Transfer is consummated. At its election, the General Partner may seek reimbursement of such Transfer Expenses either through a direct reimbursement by the transferor or through a charge to the transferor's Capital Account. If the transferor has not reimbursed the Partnership for any Transfer Expenses incurred by the Partnership in consummating a Transfer within thirty (30) days after the General Partner has delivered to such Partner written demand for payment, the General Partner, in its sole discretion, may charge the transferee's Capital Account with any such Transfer Expenses.

**11.2.6   Admission of Substituted Limited Partners.**

Any transferee of a Partnership interest transferred in accordance with the provisions of this Article 11 shall be admitted as a substituted Limited Partner only with the General Partner's prior written consent to such substitution (which may be withheld for any reason or for no reason). Without the prior written consent of the General Partner to such substitution and the written opinion of counsel required by 11.2.4 (or waiver thereof by the General Partner), no transferee of a Partnership interest shall be admitted as a substituted Limited Partner.  The transferee of an interest in the Partnership transferred pursuant to Article 11 that is admitted to the Partnership as a substituted Limited Partner shall succeed to the rights and liabilities of the transferor Limited Partner and, after the effective date of such admission, the Subscription, Contribution and Capital Account of the transferor shall become the Subscription, Contribution and Capital Account, respectively, of the transferee, to the extent of the interest transferred.

**11.2.7   Status of Transferee Not Admitted as Partner.**

*11.2.7.1   Permitted Transfer.*

> (a)     Any transferee in a Transfer made in accordance with this Article 11 shall have all the economic rights of a Limited Partner with respect to the interest transferred, to the maximum extent permitted by the Delaware Act and the Code.

> (b)     Until and unless the transferee of part or all of the interest of a Limited Partner is admitted to the Partnership as a substituted Limited Partner pursuant to 11.2.6, (1) that transferee shall have no right to participate with the Limited Partners in any votes taken or consents granted or withheld by the Limited Partners hereunder, and (2) the transferor shall remain liable to the Partnership for all contributions and other amounts payable with respect to the transferred interest to the same extent as if no Transfer had occurred.

*11.2.7.2   Non-permitted Transfer.*

> (a)     Unless and until all requirements set forth in this Article 11 have been satisfied with respect to a proposed Transfer, the General Partner shall be permitted to treat the transferor as the sole owner of the interest in the Partnership purportedly transferred, shall make no distributions to the purported transferee and shall not be required to furnish to such Person any tax or financial information regarding the Partnership, and shall not be required in any way to treat the purported transferee as an owner of any interest in the Partnership (either legal or equitable), unless otherwise required by law.

> (b)     The Partnership shall be entitled to seek injunctive relief, at the expense of the putative transferor, to prevent any such purported Transfer.

**11.2.8   Multiple Ownership; Other Provisions.**

*11.2.8.1   Multiple ownership.*

In the event of any Transfer which shall result in multiple ownership of any Limited Partner's interest in the Partnership, the General Partner may require one or more trustees or nominees to be designated as representing a portion of or the entire interest transferred for the purpose of receiving all notices which may be given, and all payments which may be made, under this Agreement and for the purpose of exercising all rights which the transferor as a Limited Partner has pursuant to the provisions of this Agreement.

*11.2.8.2  Covenants of Limited Partners.*

Each Limited Partner agrees with all other Partners that it will not make any Transfer of all or any part of its interest in the Partnership except in accordance with the provisions of this Article 11.

**11.3    NO WITHDRAWAL RIGHTS.**

No Partner shall have the right to withdraw its capital and profits from the Partnership, or to demand and receive any Partnership property in exchange for such Partner's interest in the Partnership, except to the extent explicitly set forth in this Agreement.

**11.4    SECTION 1045 ROLLOVER MATTERS.**

Each Partner agrees, with respect to its limited partnership interest, that it will not, and will not require the Partnership to, elect the application of Section 1045 of the Code (dealing with rollovers of "qualified small business stock" as defined in Section 1202 of the Code) or corresponding provisions of any state income tax law for sales of such interests or stock. In addition, each Partner agrees that the Partnership shall not be required to comply with any tax reporting or accounting requirements (including those related to the adjustment of the tax basis of any asset of the Partnership or the interest in the Partnership of any Partner) that may be imposed under Section 1045 of the Code with respect to rollovers of qualified small business stock by the Partnership or by or on behalf of any Partner.

## ARTICLE 12 — EXCULPATION AND INDEMNIFICATION

**12.1    EXCULPATION.**

**12.1.1  General.**

    (a)    To the furthest extent permitted by applicable law, no Covered Person shall be liable, responsible or accountable, whether directly or indirectly, in contract or tort or otherwise, to the Partnership, any Partner or any other Person in which the Partnership has a direct or indirect interest for any loss, damage, liability, interest, penalty, cost and expense (including, without limitation, attorneys' fees) (a "**Loss**"), asserted against or suffered or incurred by the Partnership, any Partner or any other Person which arises out of or relates to any investment or any other action or omission of such Covered Person if (1) such Covered Person determined that such course of conduct was in, or not opposed to, the best interest of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful, and (2) such course of conduct did not constitute a breach of such Person's fiduciary duty to the Partnership, a material breach of this Agreement or fraud.

    (b)    For purposes of 12.1.1(a), "**Covered Person**" shall mean the General Partner (including, without limitation, the General Partner acting as Tax Matters Partner or as liquidator) and its members, managers, officers, directors, employees, agents and Affiliates.

**12.1.2  Activities of Others.**

No Covered Person shall be liable, responsible or accountable, whether directly or indirectly, in contract or tort or otherwise, for any Loss for the negligence, whether of omission or commission, dishonesty or bad faith of any employee, broker or other agent of the Partnership selected by any Covered Person with reasonable care.

### 12.1.3  Liquidators.

No Person other than the General Partner that serves as liquidator pursuant to Article 10 shall be liable to the Partnership or any Partner for any Loss asserted against or suffered or incurred by the Partnership or any Partner which arises out of or relates to any action or omission of such Person in connection with or related to this Agreement or any matter or transaction contemplated hereby, *provided that* such Person determined that such course of conduct was in, or was not opposed to, the best interest of the Partnership and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such Person's conduct was unlawful; *provided, however*, that this 12.1.3.2 shall not affect the General Partner's right to exculpation pursuant to 12.1.1.

### 12.1.4  Advice of Experts.

No Covered Person and no Person serving as liquidator shall be liable to the Partnership or any Partner for any Loss with respect to or in connection with any action or omission taken or suffered or incurred by any of them in connection with or related to this Agreement or any matter or transaction contemplated hereby if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law of legal counsel, or as to matters of accounting of accountants, or as to matters of valuation of investment bankers or appraisers, *provided that* any such professional or firm is selected by any such Person with reasonable care.

### 12.2    INDEMNIFICATION.

### 12.2.1  General.

To the furthest extent permitted by applicable law, the General Partner, its members, managers, officers, employees, organizer, and agents, each liquidating trustee (if any), and each partner, member, shareholder, director, officer, manager, employee, organizer, agent and Affiliate of any of the foregoing (each, an "**Indemnitee**"), shall be indemnified and held harmless, subject to the other provisions of this Agreement, by the Partnership (only out of Partnership assets, including the proceeds of liability insurance) against any claim, demand, controversy, dispute, judgment and/or Loss incurred by or imposed upon the Indemnitee in connection with any action, suit or proceeding (including any proceeding before any administrative or legislative body or agency), to which the Indemnitee may be made a party or otherwise involved or with which the Indemnitee shall be threatened, which arises out of or relates to any investment or any other action or omission of such Indemnitee in connection with the Partnership or this Agreement or by reason of the Indemnitee's being at the time the cause of action arose or thereafter, the General Partner (including, without limitation, the General Partner acting as Tax Matters Partner or liquidator), a member, manager, officer, employee or agent of the General Partner, a liquidating trustee (if any), a partner, member, stockholder, director, officer, manager, employee, agent or Affiliate of any of the foregoing, or a partner, member, director, officer, manager, employee, consultant or agent of any other organization in which the Partnership owns or has owned an interest (whether directly or indirectly) or of which the Partnership is or was a creditor, which other organization the Indemnitee serves or has served as a partner, member, director, officer, manager, employee, consultant or agent at the request of the Partnership (whether or not the Indemnitee continues to serve in such capacity at the time such action, suit or proceeding is brought or threatened).

### 12.2.2  Effect of Judgment.

An Indemnitee shall not be indemnified with respect to matters as to which the Indemnitee shall have been finally adjudicated in any such action, suit or proceeding (a) not to have acted in the reasonable belief that the Indemnitee's action was in, or not opposed to, the best interests of the Partnership or to

have acted with unlawful misconduct, or in breach of such Person's fiduciary duty to the Partnership, or (b) with respect to any criminal action or proceeding, to have had cause to believe beyond any reasonable doubt the Indemnitee's conduct was criminal.

### 12.2.3   Effect of Settlement.

In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement except for matters as to which the Partnership is advised by counsel (who may be counsel regularly retained to represent the Partnership) that the Person seeking indemnification, in the opinion of counsel, (a) did not act in the reasonable belief that such Person's action was in, or not opposed to, the best interest of the Partnership, or (b) acted with unlawful misconduct, or in breach of such Person's fiduciary duty to the Partnership, or, with respect to any criminal action or proceeding, that the Person seeking indemnification had cause to believe beyond any reasonable doubt that such Person's conduct was criminal.

### 12.2.4   Advance Payment of Expenses.

The Partnership may pay the expenses incurred by an Indemnitee in connection with any such action, suit or proceeding, or in connection with claims arising in connection with any potential or threatened action, suit or proceeding, in advance of the final disposition of such action, suit or proceeding, upon receipt of an enforceable undertaking by such Indemnitee to repay such payment if the Indemnitee shall be determined to be not entitled to indemnification for such expenses pursuant to this Article 12; *provided, however*, that in such instance the Indemnitee is not defending an actual or threatened claim, action, suit or proceeding against the Indemnitee by the Partnership and/or the General Partner (or by the Indemnitee against the Partnership and/or the General Partner).

### 12.2.5   Insurance.

At its election, the General Partner, on behalf of the Partnership, may cause the Partnership to purchase and maintain insurance, at the expense of the Partnership and to the extent available, for the protection of the General Partner, any manager, member, officer, employee, agent or Affiliate of the General Partner, any liquidating trustee, or any partner, member, stockholder, officer, director, manager, employee, agent or Affiliate of any of the foregoing against any liability incurred by such Person in any such capacity or arising out of such Person's status as such, whether or not the Partnership has the power to indemnify such Person against such liability.

### 12.2.6   Other Provisions.

### *12.2.6.1   Successors.*

The foregoing right of indemnification shall inure to the benefit of the executors, administrators, heirs, personal representatives, successors or assigns of each such Indemnitee.

### *12.2.6.2   Rights to indemnification from other sources.*

The rights to indemnification and advancement of expenses conferred in this 12.2 shall not be exclusive and shall be in addition to any rights to which any Indemnitee may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.  All judgments against the Partnership or any Indemnified Person wherein such Persons are entitled to indemnification, to the fullest extent permitted by applicable law, must first be satisfied from the

Partnership's assets before the General Partner may in any way become responsible for any such obligations.

## ARTICLE 13 — AMENDMENTS, VOTING AND CONSENTS

**13.1    AMENDMENTS.**

**13.1.1    Consent of Partners.**

Except as otherwise provided in this Agreement, the terms and provisions of this Agreement may be waived, modified, terminated or amended, during or after the term of the Partnership, only with the prior written consent of the General Partner and a Majority in Interest of the Limited Partners; *provided, however,* that any provision of this Agreement requiring the written vote or consent of a greater percentage in interest of the Limited Partners may be waived, modified, terminated or amended only with the vote or written consent of the General Partner and such greater percentage in interest of the Limited Partners as is required by such provision.

**13.1.2    Limitations.**

> (a)    No amendment shall dilute the relative interest of any Partner in the profits or capital of the Partnership or in allocations or distributions attributable to the ownership of such interest without the prior written consent of such Partner (except such dilution as may result from additional Subscriptions from the Partners or the admission of additional Limited Partners pursuant to this Agreement).

> (b)    This 13.1.2 shall not be amended without the unanimous consent of all Partners.

**13.1.3    Notice of Amendments.**

The General Partner shall furnish copies of any amendments to this Agreement to all Partners, other than changes in Schedule A to reflect the admission, withdrawal or substitution of Partners, changes in the addresses of Partners and changes in the Subscriptions of Partners (in each case occurring pursuant to this Agreement) which shall not require the consent of or notice to any Limited Partner.

**13.1.4    Corrective Amendments.**

Notwithstanding the other provisions of this Article 13, the General Partner, without the consent of any other Partner, may amend any provisions of this Agreement (a) to add to the duties or obligations of the General Partner or surrender any right granted to the General Partner herein; *provided, however,* no such duty or obligation added or right surrendered may be material in light of the existing duties, obligations and rights of the General Partner; (b) to correct or supplement any provision herein which may be inconsistent with any other provision herein or to correct any printing, stenographic or clerical errors or omissions in order that this Agreement shall accurately reflect the agreement among the Partners; and (c) to amend Schedule A to provide any necessary information regarding any additional Limited Partner or substituted Limited Partner; provided that no amendment shall be made pursuant to this 13.1.4 unless the General Partner reasonably shall have determined that such amendment will not subject any Limited Partner to any material adverse economic consequences, alter or waive the right to receive allocations and distributions that otherwise would be made to any Limited Partner, or alter or waive in any material respect the duties and obligations of the General Partner to the Partnership or the Limited Partners.

**13.2    VOTING AND CONSENTS.**

Whenever action is required by this Agreement to be taken by a specified percentage in interest of the Limited Partners, such action shall be deemed to be valid if taken upon the written vote or consent of those Limited Partners whose Subscriptions in the aggregate represent the specified percentage of the aggregate Subscriptions of all Limited Partners at the time.

## ARTICLE 14 — ADMINISTRATIVE PROVISIONS

**14.1    KEEPING OF ACCOUNTS AND RECORDS; CERTIFICATE OF LIMITED PARTNERSHIP.**

**14.1.1    Accounts and Records.**

At all times the General Partner shall cause to be kept proper and complete books of account, in which shall be entered fully and accurately the transactions of the Partnership. The General Partner shall also maintain: (a) an executed copy of this Agreement (and any amendments hereto); (b) the Certificate of Limited Partnership of the Partnership (and any amendments thereto); (c) executed copies of any powers of attorney pursuant to which any certificate has been executed by the Partnership; (d) a current list of the full name, taxpayer identification number (if any) and last known address of each Partner; (e) copies of all tax returns filed by the Partnership for each of the prior three years, as applicable; and (f) all financial statements of the Partnership for each of the prior three years, as applicable. These books and records shall at all times be maintained at the principal office of the Partnership.

**14.1.2    Certificate of Limited Partnership.**

The General Partner shall file for record with the appropriate public authorities and, if required, publish the Certificate of Limited Partnership of the Partnership and any amendments thereto and take all such other action as may be required to preserve the limited liability of the Limited Partners in any jurisdiction in which the Partnership shall conduct operations.

**14.2    INSPECTION RIGHTS.**

**14.2.1    General.**

   (a)    At any time while the Partnership continues and until its complete liquidation and subject to 14.2.2, each Limited Partner may fully examine and audit the Partnership's books, records, accounts and assets, including bank balances.

   (b)    Any such examination or audit may be undertaken either by such Limited Partner or a designee thereof. All costs and expenses attributable to any such examination or audit shall be borne solely by such Limited Partner.

**14.2.2    Limitations.**

   (a)    Any examination or audit undertaken pursuant to 14.2.1 shall be made (1) only upon twenty (20) Business Days prior written notice to the General Partner, (2) during normal business hours, and (3) without undue disruption.

   (b)    The General Partner shall have the benefit of the confidential information provisions of Section 17-305(b) of the Delaware Act.

**14.3    FINANCIAL REPORTS.**

**14.3.1  Annual Reports.**

*14.3.1.1  Annual financial statements.*

The General Partner shall transmit to each Partner, as soon as reasonably practicable after the close of each fiscal year, the financial statements of the Partnership for such fiscal year. Such financial statements shall include unaudited balance sheets of the Partnership as of the end of such fiscal year and of the preceding fiscal year, unaudited statements of income and loss of the Partnership for such fiscal year and the preceding fiscal year, and unaudited statements of changes in capital for such fiscal year and for the preceding fiscal year. In addition, the General Partner shall provide quarterly updates to each Partner as it deems appropriate.

*14.3.1.2  Tax information.*

The General Partner shall also transmit to each Partner, as soon as reasonably practicable after the close of each fiscal year, such Partner's Schedule K-1 (Internal Revenue Service Form 1065) or an equivalent report indicating such Partner's share of all items of income or gain, expense, loss or other deduction and tax credit of the Partnership for such year, as well as the status of its Capital Account as of the end of such year, and such additional information as it reasonably may request to enable it to complete its tax returns or to fulfill any other reporting requirements, provided that the General Partner can obtain such additional information without unreasonable effort or expense.

**14.4    VALUATION.**

**14.4.1  Valuation by General Partner.**

If and when valuation of Partnership assets or net assets is required, the General Partner shall determine the fair market value thereof in good faith. The determination of the fair market value of assets of the Partnership shall be based upon all relevant factors, including, without limitation, such of the following factors as may be relevant: appraisals; lender valuations; discounted cash flow analyses; current financial position and current and historical operating results of the issuer; sales prices of recent public or private transactions in the same or similar securities; general level of interest rates; restrictions on transfer; the price paid by the Partnership to acquire the asset; and all other factors affecting value. In making any such determination of the fair market value of the assets of the Partnership, no allowance of any kind shall be made for goodwill or the name of the Partnership, the Partnership's office records, files and statistical data, or any other intangible assets of the Partnership.

**14.5    ANNUAL MEETINGS.**

At the General Partner's discretion, the Partnership may hold an annual meeting. In addition, at the General Partner's discretion, individual meetings may be held in addition to an annual meeting. Upon the written request to the General Partner of the Limited Partners with 50.1% or more of the Contributions, an annual or special meeting of the Limited Partners will be held.

**14.6    NOTICES.**

**14.6.1  Delivery.**

Except where otherwise specifically provided in this Agreement, all notices, requests, consents, approvals and statements shall be in writing and, if properly addressed to the recipient in the manner required by

14.6.2, shall be deemed for purposes of this Agreement to have been delivered: (a) on the date of actual receipt if delivered personally to the recipient; (b) three (3) Business Days after mailing by first class mail, postage prepaid; (c) on the date of transmission by email or electronic facsimile transmission; or (d) one (1) Business Day after deposit with a reputable overnight courier service.

### 14.6.2  Addresses.

A written document shall be deemed to be properly addressed, if to the Partnership or to any Partner, if addressed to such Person at such Person's address as set forth in Schedule A, or to such other address or addresses as the addressee previously may have specified by written notice given to the other parties in the manner contemplated by 14.6.1; provided, that any such notice given to the Partnership or the General Partner shall only be deemed to have been properly given if a copy thereof shall also have been timely given to Duane Morris LLP, 227 W. Monroe Street, Suite 3400, Chicago, IL 60606; Fax No. (312) 499-6701.

### 14.7    ACCOUNTING PROVISIONS.

### 14.7.1  Fiscal Year.

The fiscal year of the Partnership shall be the calendar year, or such other year as may be required by the Code.

### 14.7.2  Accounting Method.

The Partnership shall use the accrual method of accounting for United States federal income tax purposes.

### 14.7.3  Independent Accountants.

The Partnership's independent public accountants shall at all times be a recognized independent public accounting firm selected by the General Partner.

### 14.7.4  Organizational Expenses.

#### 14.7.4.1  General.

The Organizational Expenses of the Partnership shall be amortized for United States federal income tax purposes over a 60-month period to the extent permitted by Section 709 of the Code.

#### 14.7.4.2  Placement fees.

The Partnership shall have the ability (but no obligation) to pay any finder's fees, sales commissions or other related expenses in connection with the sale of an interest in the Partnership.

### 14.8    GENERAL PROVISIONS.

### 14.8.1  Power of Attorney.

#### 14.8.1.1  General.

Each of the undersigned by execution of this Agreement constitutes and appoints the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute, sign, acknowledge and deliver or file (a) the Certificate of Limited Partnership and any other instruments,

documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (b) all instruments, documents and certificates that may be required to effectuate the dissolution and termination of the Partnership in accordance with the provisions hereof and the Delaware Act, (c) all other amendments of this Agreement or the Certificate of Limited Partnership contemplated by this Agreement including, without limitation, amendments reflecting the addition, substitution or increased capital contributions of any Partner pursuant to 3.2.4, or any action of the Partners duly taken pursuant to this Agreement whether or not such Partner voted in favor of or otherwise approved such action, and (d) any other instrument, certificate or document required from time to time to admit a Partner, to effect its substitution as a Partner, to effect the substitution of the Partner's assignee as a Partner, or to reflect any action of the Partners provided for in this Agreement.

### 14.8.1.2  *Limitation.*

No actions shall be taken by the General Partner under the power of attorney granted pursuant to this 14.8.1 that would have any adverse effect on the limited liability of any Limited Partner.

### 14.8.1.3  *Survival.*

The foregoing grant of authority (a) is a special power of attorney coupled with an interest in favor of the General Partner and as such shall be irrevocable and shall survive the death or disability of a Partner that is a natural person or the merger, dissolution or other termination of the existence of a Partner that is a corporation, association, partnership, limited liability company or trust, and (b) shall survive the assignment by the Partner of the whole or any portion of its interest, except that where the assignee of the whole thereof has furnished a power of attorney, this power of attorney shall survive such assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect any permitted substitution of the assignee for the assignor as a Partner and shall thereafter terminate.

### 14.8.2  Execution of Additional Documents.

Each Partner hereby agrees to execute all certificates, counterparts, amendments, instruments or documents that may be required by laws of the various jurisdictions in which the Partnership conducts its activities, to conform with the laws of such jurisdictions governing limited partnerships.

### 14.8.3  Binding on Successors.

This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, assigns and legal representatives of the parties hereto.

### 14.8.4  Governing Law.

This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without regard to choice of law principles.

### 14.8.5  Waiver of Partition.

Each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Partnership's property.

**14.8.6  Securities Law Matters.**

**EACH PARTNER UNDERSTANDS THAT IN ADDITION TO THE RESTRICTIONS ON TRANSFER CONTAINED IN THIS AGREEMENT, IT MUST BEAR THE ECONOMIC RISKS OF ITS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR UNDER ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND, THEREFORE, MAY NOT BE SOLD OR OTHERWISE TRANSFERRED UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT AND ANY SUCH OTHER APPLICABLE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.  EACH PARTNER AGREES WITH ALL OTHER PARTNERS THAT IT WILL NOT SELL OR OTHERWISE TRANSFER ITS INTEREST IN THE PARTNERSHIP UNLESS SUCH INTEREST HAS BEEN SO REGISTERED OR IN THE OPINION OF COUNSEL FOR THE PARTNERSHIP, OR OF OTHER COUNSEL REASONABLY SATISFACTORY TO THE PARTNERSHIP, SUCH AN EXEMPTION IS AVAILABLE.**

**14.8.7  Miscellaneous.**

(a)    Whenever the context of this Agreement permits, the masculine gender shall include the feminine and neuter genders, and reference to singular or plural shall be interchangeable with the other.  All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Partnership until expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

(b)    The invalidity or unenforceability of any one or more provisions of this Agreement shall not affect the other provisions, and this Agreement shall be construed and reformed in all respects as if any such invalid or unenforceable provision(s) were omitted in order to give effect to the intent and purposes of this Agreement.

(c)    References in this Agreement to particular sections of the Code or the Delaware Act or any other statute shall be deemed to refer to such sections or provisions as they may be amended after the date of this Agreement.  Unless otherwise requested by the General Partner, all payments required to be made by any Limited Partner pursuant to this Agreement shall be payable only in United States dollars.  All dates and times specified in this Agreement are of the essence and shall be strictly enforced.

(d)    This Agreement (together with the Subscription Agreement signed by each Partner, respectively) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior understanding or agreement (whether oral or in writing) among the parties.  Captions in this Agreement are for convenience only and do not define or limit any term of this Agreement.

(e)    This Agreement or any amendment hereto may be signed in any number of counterparts, each of which when signed by the General Partner shall be an original, but all of which taken together shall constitute one agreement or amendment, as the case may be.

(f)    A faxed signature hereto shall be deemed as legally binding as a signed original hereof.

(g)     Each Partner hereby agrees and acknowledges that: (i) the law firm retained by the General Partner and the Partnership (the "**GP's Counsel**") in connection with the formation of the Partnership, the offering of the Limited Partner interests and the management and operation of the Partnership does not and will not represent the Limited Partners in connection with any such matter or in connection with any dispute that may arise between the Limited Partners on the one hand and the General Partner and the Partnership on the other (the "**Partnership Legal Matters**"); (ii) Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect to each of the foregoing matters described immediately above; and (iii) Each Limited Partner hereby agrees that the GP's Counsel  may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners).

(h)     Unless the General Partner gives its prior written consent, each Limited Partner agrees to maintain the confidentiality of information and documents relating to the Partnership and its affairs, and the General Partner, including any information relating to any investment of the Partnership or information provided to the Limited Partner during the term of the Partnership, except (i) as otherwise required by applicable law, regulation, subpoena or legal process, (ii) for disclosure by such Limited Partner to directors, trustees, officers, partners, employees of, agents, legal counsel, independent auditors or consultants for, such Limited Partner responsible for matters relating to the Partnership which such disclosed information shall itself be held in confidence by the receiving party or (iii) where such information being disclosed is otherwise generally available to the public. Prior to any disclosure of information by a Limited Partner pursuant to subsections (i)-(iii), such Limited Partner shall give the General Partner written notice at least seventy-two (72) hours in advance of any such anticipated disclosure and shall cooperate with the General Partner to preserve the confidentiality of such information consistent with applicable law.  Notwithstanding the foregoing, Partners (and each employee, representative, or other agent of each Partner) may disclose to any and all persons, without limitation of any kind, the federal tax treatment and federal tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Partners relating to such federal tax treatment and federal tax structure, it being understood that the names of the investment's of the Partnership are not part of the tax treatment or tax structure.  The preceding sentence is intended to cause the transactions contemplated hereby to not be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the treasury regulations promulgated under Section 6011 of the Code, and shall be construed in a manner consistent with such purpose.  In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the tax structure of the transactions contemplated hereby or any tax matter or tax idea related thereto.

#351390

- 32 -

IN WITNESS WHEREOF, THE UNDERSIGNED HAS EXECUTED THIS LIMITED PARTNERSHIP AGREEMENT OF SUPPLEMENT PARTNERS, L.P. AS OF THE DATE FIRST ABOVE WRITTEN.

GENERAL PARTNER:
J&R VENTURES, LLC

By: _____
    Title:

## Limited Partner Signature Page

IN WITNESS WHEREOF, the undersigned has executed this Agreement for the purchase of a limited partnership interest (the "**Interest**") in Supplement Partners, L.P. (the "**Partnership**"). This page constitutes the signature page for each of (i) the Subscription Agreement for the purchase of the Interest in the amount set forth below, and (ii) the Limited Partnership Agreement of the Partnership. Upon acceptance by the General Partner, the undersigned shall be admitted as a Limited Partner of the Partnership and hereby authorizes this signature page to be attached to a counterpart of this Limited Partnership Agreement executed by the General Partner.

Subscription

_____

Amount of Interest Purchased:

(Print or Type Name of Investor)

Option A:

[*Sign Here*]:

$_____

Option B:

By:_____

$_____

Social Security or
Federal Tax Identification No.:

(Title, if applicable)_____

_____

Typed or printed name and
address of Investor:

Preferred address for receiving
Communications (*Do not complete
if already listed on prior column*):

_____    _____

_____    _____

Email Address:_____

Type of Entity (*e.g. individual, corporation, estate, trust, partnership, exempt organization, nominee, custodian*):

Telecopier No.:_____

_____

**THE LIMITED PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND WITH THE APPROVAL OF THE GENERAL PARTNER. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

**EXCEPT AS OTHERWISE PROVIDED IN THIS LIMITED PARTNERSHIP AGREEMENT, A LIMITED PARTNER MAY NOT SELL, ASSIGN, TRANSFER, PLEDGE OR OTHERWISE DISPOSE OF ALL OR ANY PART OF ITS INTEREST IN THE PARTNERSHIP UNLESS THE GENERAL PARTNER (AS DEFINED HEREIN) HAS CONSENTED THERETO.**

## ACKNOWLEDGMENT OF SIGNATURE

STATE/COUNTRY OF                 )

                                       )     SS:

COUNTY/PROVINCE OF            )

          On this ___ day of _____, 200_, before me personally came _____, known to me to be the _____ of the Limited Partner named above, or the individual so named above, and made oath that he or she executed the above instrument as his or her own free act and deed, and in the capacity therein stated, as the authorized representative of the person or entity set forth above, or in any individual capacity.

                                         _____

                                                Notary Public

                              My commission expires: _____

APPENDIX I

**Supplement Partners, L.P.**

DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both singular and plural forms of the terms so defined). Additional defined terms are set forth in the provisions of this Agreement to which they relate.

| | |
|---|---|
| **Affiliate** | With respect to the Person to which it refers, a Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such subject Person. For this purpose, each Principal shall be deemed to be an Affiliate of the General Partner. |
| **Business Day** | Any day on which banking institutions in the City of Chicago, Illinois, are not required by law to remain closed. |
| **Call Notice** | As set forth in 6.2.1. |
| **Capital Account** | As set forth in 8.1.1. |
| **Code** | The United States Internal Revenue Code of 1986, as amended from time to time, or any successor statute thereto. |
| **Contribution** | With respect to any Partner and at any time, the aggregate amount of capital contributions made to the Partnership by such Partner in cash at or before such time pursuant to this Agreement, (a) *increased*, at the time that any part of a Default Charge is added to the Contribution of such Partner pursuant to 6.4, by the amount so added; and (b) *decreased*: |

     (1)   At the time that any amount treated as a partial return of such Partner's Contribution pursuant to 6.3 is distributed to such Partner, by the amount so treated;

     (2)   At the time that all or any part of a Default Charge is subtracted from the Contribution of such Partner pursuant to 6.4, by the amount so subtracted; and

     (3)   At the time that the Partnership pays any placement fees or other expenses on behalf of such Partner pursuant to 14.7.4.2, by the amount so paid.

Except as provided in the preceding sentence, a Partner's Contribution shall not be reduced on account of any distributions of capital to such Partner or for any other reason. The Contribution of the General Partner shall not include any special contributions made by the General Partner to the Partnership pursuant to 6.1.3.

| | |
|---|---|
| **Cost** | With respect to Partnership assets and unless the context otherwise requires, the Partnership's adjusted tax basis in such assets for federal income tax purposes, *provided*, *however*, that, if the Partnership has made an election under Section 754 of the Code, such tax basis shall be determined after giving |

effect to adjustments made under Section 734 of the Code but (except as provided in Treasury Regulations Section 1.734-2(b)(1)) without regard to adjustments made under Section 743 of the Code.

**Covered Person**    As set forth in 12.1.1.

**Default Charge**    As set forth in 6.4.2.1.

**Default Rate**    With respect to any period, the Prime Rate for such period plus five percent (5%).

**Defaulting Partner**    As set forth in 6.4.1.3.

**Deficiency Drawdown**    As set forth in 6.1.2.1.

**Delaware Act**    As set forth in 2.1.

**Delayed Payment Interest**    Partnership income attributable to (a) interest paid by any Defaulting Partner pursuant to 6.4 on costs of collecting unpaid capital contributions; and (c) interest paid by any Limited Partner pursuant to 7.3.2 (relating to withholding taxes).

**Designated Jurisdiction**    From time to time, that combination of state, county, city and other taxing jurisdictions in which the General Partner or any member of the General Partner resides or is domiciled that, at such time, collectively imposes the highest marginal rate of income tax on its residents or domiciliaries, as determined by the General Partner after consultation with the Partnership's accountants and other advisors.

**Distributable Proceeds**    All cash received by the Partnership that is attributable to any Portfolio Investment and has not previously been distributed to the Partners (including payments in cash of interest, dividends and principal) and proceeds from the sale or disposition of any Portfolio Security and any other cash that the General Partner determines is otherwise available for distribution to the Partners, including, without limitation, the proceeds received from the sale, disposition, exchange, refinancing or dissolution and liquidation of any Portfolio Investment or the underlying asset(s) thereof after the payment or provision or reservation for payment by the Partnership of all expenses incurred by the Partnership in connection with disposing of such Portfolio Security (including, but not limited to, brokers' fees and other selling expenses), and in collecting any amounts then owed to the Partnership and so attributable, and any other reasonable amount determined by the General Partner as being prudent to set aside for Partnership contingencies and anticipated obligations.

**Drawdown**    As set forth in 6.1.1.1.

**Drawdown Date**    As set forth in 6.2.1.

**General Partner**    J&R Ventures, LLC, a Nevada limited liability company, and any successor general partner under this Agreement.

| | |
|---|---|
| **GP Expense Items** | As set forth in 6.1.3(b). |
| **Indemnitee** | As set forth in 12.2.1. |
| **Initial Closing Date** | June , 2006. |
| **Initial Drawdown Date** | The due date of the Partnership's first Drawdown. |
| **Limited Partners** | Those Persons listed in Schedule A as limited partners, together with any additional or substituted limited partners admitted to the Partnership after the date hereof. |
| **Loss** | As set forth in 12.1.1(a). |
| **Majority in Interest** | Limited Partners (other than Defaulting Partners) with more than one-half of the aggregate Voting Interests of all Limited Partners (other than Defaulting Partners). |
| **Net Gain or Loss** | With respect to any fiscal year, the sum of the Partnership's: |

    (a) Net gain or loss attributable to the sale or exchange of Portfolio Securities during such fiscal year;

    (b) Dividend and interest income for such fiscal year (if any) that is attributable to investments in Portfolio Securities;

    (c) Other items of income and gain for such fiscal year that are attributable to its Portfolio Securities and are not included in (a) or (b), including any income exempt from federal income tax; and

    (d) A negative number equal to all Partnership losses for such fiscal year not taken into account under clauses (a) or (b) above, and all expenses properly chargeable to the Partnership for such fiscal year (whether deductible or non-deductible and whether described in Section 705(a)(2)(B) of the Code, treated as so described pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*), or otherwise).

For this purpose, Net Gain or Loss shall be determined in accordance with tax accounting principles rather than generally accepted accounting principles, and the following items shall be disregarded:

    (1) All items specially allocated pursuant to 8.3, 8.4 or 8.5 or Appendix II; and

    (2) Expenses required to be capitalized and included in the Partnership's adjusted tax basis in any asset or which reduce the amount realized by the Partnership on the disposition of any asset.

| | |
|---|---|
| **Organizational** | With respect to any fiscal year, all Partnership expenses for such fiscal year that are attributable to organization of the Partnership and the General Partner |

| | |
|---|---|
| **Expenses** | and the sale of interests in the Partnership to the Limited Partners, including, without limitation, reasonable legal, accounting, marketing, filing, copying, and related organizational costs and expenses. |
| **Partners** | The General Partner and the Limited Partners. |
| **Partnership** | Supplement Partners, L.P., a Delaware limited partnership. |
| **Partnership Expenses** | All expenses properly borne by the Partnership hereunder, including the Organizational Expenses. |
| **Person** | Any individual, general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, or other entity (and the heirs, executors, administrators, legal representative, successors and assigns of such Person where the context so admits). |
| **Portfolio Company** | Any Person (other than an individual) in which the Partnership has an investment, including, without limitation, Xyience Incorporated, a Nevada corporation. |
| **Portfolio Investment** | An investment by the Partnership in which securities are acquired by the Partnership. |
| **Portfolio Securities** | Any securities received by the Partnership in connection with a Portfolio Investment or Portfolio Company, as applicable. |
| **Preferred Return** | As set forth in 7.2.4. |
| **Regulatory Allocations** | As set forth in Part 1.4 of Appendix II. |
| **Remaining Commitment** | With respect to any Partner, its Subscription, *Reduced* by the amount of all capital contributions made by such Partner (or its predecessors in interest) pursuant to this Agreement and the amount of any reduction in such Partner's Remaining Commitment pursuant to 6.4.4.2. |
| **Restoration Amount** | With respect to any Partner and at any time, such Partner's Remaining Commitment at such time and, solely with respect to the General Partner and at such time, an additional amount equal to the amount that the General Partner would be required to return to the Partnership at that time (or within 90 days thereafter) pursuant to 7.5.1 if each asset of the Partnership were sold at such time for amount equal to its Cost, all of the Partnership's liabilities to Persons other than Partners were satisfied (to the extent possible) with Partnership funds, all items of Partnership income, gain, loss or expense were allocated to the Partners in accordance with Article 8, and any remaining cash was distributed to the Partners pursuant to Article 7. |
| **Securities Act** | The United States Securities Act of 1933, as amended from time to time, or any successor statute thereto. |

| | |
|---|---|
| **Subscription** | With respect to any Partner, the total amount that such Partner has agreed to contribute to the Partnership as reflected, with respect to each Partner, in Schedule A opposite such Partner's name under the column headed "Total Subscription." |
| **Tax Distribution** | As set forth in 7.2.1. |
| **Tax Liability** | As set forth in 7.3.1. |
| **Tax Matters Partner** | As set forth in 3.3.1.2. |
| **Transfer** | As set forth in 11.1. |
| **Transfer Expenses** | As set forth in 11.2.5. |
| **Treasury Regulations** | The regulations promulgated by the United States Department of the Treasury under the Code, as amended. |
| **United States** | The United States of America. |
| **United States Person** | The meaning given to that term in Section 7701(a)(30) of the Code. |
| **Voting Interests** | For the purpose of any vote or consent right hereunder, at any time, the interest of each Limited Partner as determined by reference to the amount of such Limited Partner's Capital Account balance. |

APPENDIX II

## REGULATORY AND TAX ALLOCATIONS

**1.     Regulatory Allocations.**

The following provisions are included in order to comply with tax rules set forth in the Code and to permit the Partnership to obtain the benefits of a "safe harbor" provided by Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*).

**1.1     Qualified Income Offset.**

If any Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(*4*), (*5*) or (*6*), and such adjustment, allocation or distribution causes such Partner to have a deficit balance in such Partner's Capital Account which exceeds such Partner's Restoration Amount or further reduces a balance in such Partner's Capital Account that already has a deficit balance exceeding such Partner's Restoration Amount, there shall be allocated to such Partner items of income and gain (consisting of a pro rata portion of each item of Partnership income, including gross income, and gain for such fiscal period) in an amount and manner sufficient to eliminate such Partner's deficit Capital Account balance, to the extent required by Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*), as quickly as possible, provided that an allocation pursuant to this 1.1 shall be made only if and to the extent that the deficit in such Partner's Capital Account would exceed such Partner's Restoration Amount after all allocations provided for in Article 8 of the Agreement and in this Appendix II have been made tentatively as if this 1.1 were not included in this Agreement. The foregoing sentence is intended to constitute a "qualified income offset" provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*), and shall be interpreted and applied in all respects in accordance with that Section.

**1.2     Gross Income Allocation.**

In the event that any Partner has a negative Capital Account at the end of any Partnership fiscal year which is in excess of such Partner's Restoration Amount, there shall be allocated to such Partner items of Partnership income (including gross income) and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this 1.2 shall be made only if and to the extent that the deficit in such Partner's Capital Account would exceed such Partner's Restoration Amount after all allocations provided for in Article 8 of the Agreement and in this Appendix II have been made tentatively as if 1.1 and this 1.2 were not included in this Appendix II.

**1.3     Adjustments to Reflect Section 754 Election.**

To the extent that an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

**1.4     Offsetting Allocations.**

The allocations set forth in 1.1, 1.2 and 1.3 of this Appendix II (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b). Notwithstanding any other provisions of Article 8 of the Agreement and of this Appendix II (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating subsequent items of income, gain, loss and expense among the Partners so that, to the extent possible, the net amount of such allocations of subsequent items of income, gain, loss and expense and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner pursuant to the provisions of Article 8 of the Agreement and this Appendix II if the Regulatory Allocations had not occurred.

For purposes of applying the foregoing sentence, allocations pursuant to this 1.4 shall be made with respect to allocations pursuant to 1.3 of this Appendix II only to the extent the General Partner reasonably determines that such allocations will otherwise be inconsistent with the economic agreement among the Partners. Further, if allocations to the General Partner include or are affected by Regulatory Allocations or allocations pursuant to this 1.4 that are intended to offset such Regulatory Allocations, the General Partner, after consulting with the Partnership's accountants and other advisors, shall have discretion to make such adjustments to subsequent allocations that the General Partner deems reasonably necessary or appropriate to effectuate the economic arrangements of the Partners.

**2.     Adjustments to Reflect Changes in Interests.**

With respect to any fiscal period during which any Partner's interest in the Partnership changes, whether by reason of the admission of a Partner, the withdrawal of a Partner, a non-pro rata contribution of capital to the Partnership or any other event described in Section 706(d)(1) of the Code and regulations issued thereunder, allocations of Net Gain, Net Loss and other items of Partnership income, gain, loss and expense shall be adjusted appropriately to take into account the varying interests of the Partners during such period; *provided, however*, that allocations on subsequent closings shall be made in the manner required by 8.4 of the Agreement. The General Partner shall consult with the Partnership's accountants and other advisors and shall select the method of making such adjustments, which method shall be used consistently thereafter.

**3.     Special Allocations of Gross Gains and Losses.**

In making allocations of Net Gain or Net Loss pursuant to Article 8 of the Agreement, the General Partner, after consulting with the Partnership's tax advisors, is authorized to separate these aggregate amounts into their components and allocate the components separately in order to further the intent of such provisions of the Agreement. For example, if with respect to a particular fiscal period the Partnership realizes a gross loss of $100 on a sale of Portfolio Securities and a gross gain of $200 on a sale of other Portfolio Securities resulting in a Net Gain of $100 ($200 gross gain minus $100 gross loss = $100 Net Gain), the General Partner may allocate the $100 gross loss as a $100 Net Loss in the manner required by 8.2.2, and then allocate the $200 gross gain as a $200 Net Gain in the manner required by 8.2.1, if advised by the Partnership's tax advisors that such special allocations will cause the Capital Accounts of the Partners to reflect more closely the Partners' relative economic interests in the Partnership.

**4.     Tax Allocations.**

For federal, state and local income tax purposes, Partnership income, gain, loss, deduction or credit (or any item thereof) for each fiscal year shall be allocated to and among the Partners in order to reflect the allocations made pursuant to the provisions of Article 8 of the Agreement and the provisions of this

Appendix II for such fiscal year (other than allocations of items which are not deductible or are excluded from taxable income), taking into account any variation between the adjusted tax basis and book value of Partnership property in accordance with the principles of Section 704(c) of the Code. However, in the event that the Partnership is required to recognize income or gain for income tax purposes under Section 684 of the Code (or a similar provision of state or local law) in respect of an in-kind distribution to a Limited Partner, then, solely for such income tax purposes, to the maximum extent permitted by applicable law (as determined by the General Partner in its reasonable discretion), the income or gain shall be allocated entirely to such Limited Partner.

**Schedule A to Limited Partnership Agreement**

**Supplement Partners, LP**

**Address of Partnership**

**[Address]**

**Names, Addresses, Telecopy Numbers and Subscriptions of Partners**

|  | TOTAL SUBSCRIPTION |
|---|---|
| **General Partner**<br>J&R VENTURES, LLC<br>[Address]<br>Telecopy #] | $ |
| **Limited Partners**<br>[Name]<br>[Address]<br>[Telecopy #] | $ |
| [Name]<br>[Address]<br>[Telecopy #] | $ |
| [Name]<br>[Address]<br>[Telecopy #] | $ |
| **Total of Limited Partner Subscriptions** | $ |
| Total | $ |

A-1